NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC. et al., and Patricia Parisi et al., Plaintiffs,

v.

Hugh L. CAREY, Individually and as Governor of the State of New York et al., Defendants,

United States of America, Amicus Curiae.

Thomas A. COUGHLIN III, Individually and as Commissioner of the Office of Mental Retardation and Developmental Disabilities, Third-Party Plaintiff-Appellee,

v.

BOARD OF EDUCATION OF THE CITY OF NEW YORK, Frank J. Macchiarola and Charles I. Schonhaut, Third-Party Defendants-Appellees.

Christine WEST, on behalf of her son Mark West, a minor, Individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

BOARD OF EDUCATION OF THE CITY OF NEW YORK, Frank J. Macchiarola, etc., Charles I. Schonhaut, etc., Defendants-Appellants.

No. 87, Docket 79–7257.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1979.

Decided Dec. 10, 1979.

Ronald E. Sternberg, New York City (Allen G. Schwartz, Corp. Counsel of the City of New York, L. Kevin Sheridan, New York City, Mary C. Tucker, Brooklyn, N. Y., on brief), for defendants-appellants.

Taylor R. Briggs, New York City (LeBoeuf, Lamb, Leiby & MacRae, New York City, on brief), for third-party plaintiff-appellee Thomas A. Coughlin, III.

Carol Kellermann, New York City (John Kirklin, Christopher A. Hansen, New York City, on brief), for plaintiff-appellee Christine West.

Drew S. Days, III, Asst. Atty. Gen., Jessica Dunsay Silver, Dennis J. Dimsey, Washington, D. C., Edward R. Korman, U. S. Atty., Brooklyn, N. Y., on brief, for the United States as amicus curiae.

Before MOORE, OAKES and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This case involves a challenge to the New York City Board of Education's decision to exclude certain mentally retarded children from regular school classes because they are carriers of serum hepatitis. Although the wisdom of this decision is sharply contested by the parties, the initial and crucial issue in the case is whether a federal court should determine the merits of the dispute by reviewing the adequacy of the factual determinations of the local administrative agency, or by requiring the agency to prove in court the validity of its position.

Most of the children involved in this case were formerly residents of Willowbrook Developmental Center, a state facility for the mentally retarded located on Staten Island. In 1972, a class action suit was brought in the United States District Court for the Eastern District of New York by the New York Association for Retarded Children, one of the plaintiffs-appellees in this case, on behalf of Willowbrook residents. The suit alleged that living conditions and treatment programs at the facility were unsatisfactory in violation of constitutional and statutory requirements. Pursuant to a consent judgment entered in April, 1975, the defendants were required to make extensive alterations in the Willowbrook program, and to "ready each resident . . . for life in the community at large." Part of this latter effort was to consist of a "full and suitable educational program" in the New York City public schools. Beginning in May, 1976, some 1,000 residents were removed from Willowbrook and placed with families or in group homes; a number of these, being of school age, were enrolled in special education programs in the public school system.[1]

---

1. "Special education" is a technical term that generally refers to programs for handicapped children. At present, the Board operates four types of special education programs for the

As a result of testing performed at the Willowbrook facility, it was known that approximately forty of the children who were ultimately enrolled in public school were carriers of hepatitis B, commonly known as serum hepatitis. The acute stage of this disease, which is relatively rare, is manifested by symptoms that vary from a mild fever to jaundice and inflammation of the liver. Carriers are those who have the hepatitis B virus, or antigen, in their blood, but do not experience any outward symptoms. It is known that carriers can transmit the disease by parenteral, or blood-to-blood routes, characteristically by transfusions or successive inoculations of different people with the same needle; however, the antigen has also been detected in the saliva of carriers, though the extent to which contact with infected saliva can transmit the disease has yet to be determined.

In September, 1977, a case of possible hepatitis B infection was reported in one New York City elementary school, and caused a considerable amount of concern among the teachers and parents. Although the report proved to be incorrect,[2] it motivated the New York City Department of Health to undertake a study of the children known to be carriers. Department officials visited ten special education classrooms, and a group of experts in the disease was assembled for a planning session on possible solutions. The conclusion, issued in the form of tentative guidelines in February, 1978, was that mentally retarded children identified as carriers of hepatitis B should be isolated in special classrooms within each school they attended. Although the Board

of Education requested that the Department of Health issue an order to exclude the carrier children from the public schools, the Department refused to do so, instead, it reissued its suggested guidelines in August, 1978.[3] The Board then acted on its own. Four days before the start of the 1978–79 school year, it sent mailgrams to the parents or caretakers of the carrier children, informing them that the children were to be excluded from public school until appropriate arrangements could be made.

The following day, plaintiff-appellee Thomas Coughlin, Commissioner of the Office of Mental Retardation and Developmental Disabilities, acting pursuant to his authority under the Willowbrook consent decree, brought an action in the District Court for the Eastern District to enjoin the Board's exclusion of the Willowbrook children. This suit was consolidated with a class action suit by plaintiff-appellee West on behalf of the Willowbrook children and the small number of other children who had been excluded. After a two-day evidentiary hearing, the District Court (John R. Bartels, Judge) granted the injunction on behalf of all plaintiffs, holding that the exclusion violated the Willowbrook Consent Decree; the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794 (1976); the Education of the Handicapped Act, 20 U.S.C. §§ 1401–1414 (1976); the New York Education Law § 4402 (McKinney 1978); and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

The Board then convened a task force to develop a new plan for the implementation

---

mentally retarded: (1) Trainable Mentally Retarded (T.M.R.) classes for moderately retarded youngsters who are capable of learning social and some occupational skills; (2) Track IV classes for severely retarded children who require training in basic tasks of living; (3) Adult Skills Training Centers for T.M.R. youngsters between the ages of 15 and 21 who can learn further social and occupational skills, so that they can function in the community; and (4) Occupational Training Centers for higher functioning youngsters between the ages of 16 and 21 who are capable of employment in normal industrial settings.

2. The person affected, a teacher, was ultimately diagnosed as suffering from hepatitis A, a different disease.

3. In the interval between issuance of the two sets of guidelines, a testing program was initiated in the T.M.R. programs where known carriers were present. Of the 450 children in this group, 270 were tested; since blood records for an additional 70 to 80 were available, the status of some 340 to 350 of the children in these programs was determined. The tests revealed an additional five children who were carriers of the disease.

of the Department of Health guidelines; when the members of this task force failed to agree, the Board developed its own plan. Under this plan, the 48 retarded children identified as carriers of hepatitis B were to be placed in nine separate classes, with at least one class located in each of the five boroughs of New York City. Each child was to be individually evaluated, and placed in an educational setting based on the results of that evaluation. The parents or other caretakers of each child were to be given the right to appeal their child's placement to a Board-established Committee on the Handicapped.

The Board then moved in the District Court for a declaratory judgment establishing the legality of its plan. This motion was opposed by appellee Commissioner Coughlin, on behalf of the Willowbrook children, appellee Christine West, on behalf of all the affected children, and the United States, as *amicus curiae*. After another evidentiary hearing, Judge Bartels held that the Board's new plan violated the Willowbrook Consent Judgment, the Rehabilitation Act of 1973, the Education of the Handicapped Act, the New York Education Law, and the Equal Protection Clause of the Fourteenth Amendment. The Board now appeals from this decision.

■ The proper resolution of this appeal necessarily depends upon the extent of the Board's obligation to prove the validity of its plan to a federal court. The Board contends that judicial review should be limited to determining whether the plan is reasonable.[4] What this means, in essence, is that the only showing that the Board would have to make is that there is a substantial basis in the administrative record for concluding that a problem exists, and that the proposed plan is rationally related to this problem. *Cf. Universal Camera*

*Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). On the other hand, the appellees contend that this is the sort of case where the challenged governmental action can be upheld only if its validity is established by evidence presented in court and found persuasive by the trier of fact.

■ There is no generally accepted rule to determine the degree of deference that federal courts should give to the factual determinations of state and local administrative agencies. The Board advances a strong argument that its factual determinations should be reviewed only to determine whether they are rational, much as state economic legislation is reviewed for constitutionality in the post-1937 era. Concededly, the Board's decision to isolate a group of children in order to guard against the spread of a serious disease involves the very essence of the state's police power to protect the health, welfare, and safety of its citizens. This decision was reached after an investigation by Department of Health staff members, and after serious consideration by professional educators from the Board. In many contexts the reasoned decision-making of administrators bearing sensitive responsibilities is entitled to judicial deference.

■ However, the courts are also assigned a sensitive task, and that task is to ensure that the established legal standards—constitutional and statutory—are followed by government agencies. To permit the factual determinations of these agencies to go unchallenged may be to neglect this task, for the facts will often be dispositive, and the question of compliance with prevailing legal standards will often be determined by the manner in which the agency has found these facts. In this case, the appellees have alleged that the Board's decision violates a prior order of a federal

---

4. Appellee Coughlin argues that the Board is being inconsistent in making this argument in the context of a motion for declaratory judgment, since the motion represents a voluntary submission to the courts of the merits of the Board's decision. That is not correct, however; a party may move for a declaratory judgment without waiving any of its substantive rights.

"[T]he principal purpose of a declaratory judgment is to clarify and settle disputed legal relationships and to relieve uncertainty, insecurity and controversy." *Broadview Chemical Corp. v. Loctite Corp.,* 474 F.2d 1391, 1393 (2d Cir. 1973). This purpose would be impaired if a motion for declaratory judgment was regarded as limiting the rights of the moving party.

court, two federal statutes, and the Fourteenth Amendment of the Constitution. Deference to the Board's fact-finding runs the risk that the commands of these various provisions will not be observed. As the Supreme Court said in reviewing a state court decision, "[t]hat the question is one of fact does not relieve us of the duty to determine whether in truth a federal right has been denied." *Norris v. Alabama,* 294 U.S. 587, 589–90, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935). See *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–92, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Fiske v. Kansas,* 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927).

It might be possible to develop some set of general rules to govern federal review of state administrative fact-finding. The preferable approach, however, is to derive the proper standard of review from the constitutional or statutory provision that the court is called upon to enforce.

■ In this case, three different sources of federal law are invoked by the plaintiffs—the Willowbrook Consent Judgment, two federal statutes, and the Equal Protection Clause. Without determining what standard of review each of these sources requires in these circumstances, we conclude that a standard dispositive of this case is properly derived from the Rehabilitation Act of 1973. Section 504 of the Act, 29 U.S.C. § 794 (1976), *as amended by* Act of Nov. 6, 1978, Pub.L. No. 95–602, 29 U.S.C.A. § 794 (Supp.1979), provides: "No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." The New York City Board of Education is a recipient of federal funds. The children in this suit are clearly handicapped within the meaning of Section 706(7). They were excluded from regular public school classes and activities "solely by reason of their handicap," since only mentally retarded youngsters who were carriers of the hepatitis B antigen were isolated; no effort was made to identify and exclude normal children who were carriers. Section 504 is thus fully applicable to this case.

■ As is apparent from its language, Section 504 is intended to be part of the general corpus of discrimination law. *Cf.* Civil Rights Act of 1964, Title VI, 42 U.S.C. § 2000d (1976) ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *id.,* Title VII, 42 U.S.C. § 2000e–2 (1976). It is a general principal of discrimination law that once the plaintiff has established a *prima facie* case that he has been discriminated against, the defendant must present evidence to rebut the inference of illegality. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); *Wade v. Mississippi Co-op Extension Service,* 528 F.2d 508 (5th Cir. 1976) (Title VI). Clearly, deference to a state agency's fact-finding is inappropriate once that agency is the defendant in a discrimination suit. The agency is required to come forward in the district court with sufficient evidence to rebut the plaintiff's *prima facie* case.[5]

While Section 504 has been the subject of infrequent litigation thus far, this Court and others confronting adverse action based on a physical handicap have implicitly assumed that the government agency or other federal funds recipient must establish in court a justification for its action. In *Kampmeier v. Nyquist,* 553 F.2d 296 (2d Cir. 1977), the trial court had refused to grant a preliminary injunction to the plain-

5. The legislative history of Section 504 is sparse, and gives no indication of Congress' intention regarding the burden of proof in actions arising under that section. *See* 1973 U.S. Code Cong. & Admin.News, pp. 2076, 2123, 2143. It is worth noting, however, that the Rehabilitation Act of 1973 was enacted by Congress within a few months after the Supreme Court's decision in *McDonnell Douglas, supra.* Congress must have been aware that the discrimination law language of Section 504 would have obvious implications for the burden of proof issue.

tiffs, thereby allowing school authorities to exclude students with vision in only one eye from participation in contact sports. To reach this conclusion, the Court assessed the evidence, including letters submitted by physicians who had examined the children. This Court affirmed the decision, basing its conclusion on the failure of the plaintiffs to refute the medical evidence presented by the public school authorities. It is apparent that the decision in this case turned on the record in the trial court, and that the plaintiffs failed because their evidence was inadequate. See also *Halderman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295 (E.D.Pa.1977); *Hairston v. Drosick,* 423 F.Supp. 180 (S.D.W.Va.1976).

▮▮▮ Requiring governmental agencies to rebut in court a *prima facie* case of discrimination against the handicapped does not mean that the expertise of responsible administrators is to be denigrated. When the validity of challenged governmental action turns on an assessment of technical matters foreign to the experience of most courts, it may be entirely appropriate to resolve closely contested disputes in favor of the responsible administrators. *Cf. Trachtman v. Anker,* 563 F.2d 512 (2d Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). We need not determine in this case the precise level of scrutiny that may be appropriate for the variety of contexts in which claims under Section 504 will arise. Having concluded that the Board is obliged to make at least some substantial showing in court that its plan is justified, we find no error in the District Court's decision that the Board completely failed to prove its case.

▮▮▮ At trial, the Board was unable to demonstrate that the health hazard posed by the hepatitis B carrier children was anything more than a remote possibility. There has never been any definite proof that the disease can be communicated by non-parenteral routes such as saliva. Even assuming that there were, the activities that occur in classroom settings were not shown to pose any significant risk that the disease would be transmitted from one child to another. While the Department of Health investigators had advised the Board

that they had observed drooling, kissing, and mouthing of mutually used equipment by the retarded children, no such evidence was presented in court. There was testimony by several educators who found no evidence of un-hygienic conditions in any of the classrooms they inspected.

▮▮▮ The lack of any evidence that a serious possibility of transmittal existed is underscored by the Board's own failure to make any comprehensive plan based on its own assessment of the situation. Specifically, the Board made no effort to identify all the children in the public schools, or even all the retarded children in the public schools, who might be carriers of hepatitis B. Instead, it merely tested the 450 children who happened to be in classrooms that included known hepatitis B carriers, a policy that casts doubt on the Board's sense of how critical the problem was. It is true, of course, that a government agency is not legally required to "choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). A step-by-step approach, however, makes sense primarily when applied to a benefits program, as in *Dandridge,* where those first affected will receive some advantage, while those excluded from the benefit will not be harmed. When the program involves quarantining those with an allegedly infectious disease, the adoption of a step-by-step approach, if not necessarily impermissible, at least suggests that the Board did not regard its own evidence of risk as particularly convincing.

In opposition to the Board's plan, the appellees were able to introduce considerable evidence about the detrimental effects of isolating the carrier children. They indicated that the plan would require each of the children to be assigned to a new class and a new teacher, and over half the children to be assigned to an entirely different school. Change of this kind, according to the testimony presented, could result in serious disorientation of these handicapped children, possibly vitiating any educational progress that they have achieved. In addition, the formation of special classes for this small group of children will naturally lead

to a decrease in the curricular options that are available for each child, and an increase in the number of children with different needs, and different levels of functioning, who must be placed together in a single classroom. Separation of the carrier children will also limit the extent to which they can participate in school-wide activities such as meals, recesses, and assemblies, and will reenforce the stigma to which these children have already been subjected.

In short, the strength of the appellees' evidence and the weakness of the Board's evidence abundantly support the conclusions reached by the District Court. We wish to make clear, however, that the Board is not barred from returning to court at some point in the future when it has evidence to support any plan appropriate to a significant health risk. Medical knowledge expands rapidly, and an agency responsible for the well-being of children must have some latitude both in monitoring current conditions and assessing those conditions in light of the most current medical information. The District Court disapproved the Board's plan on the record that was presented. New facts might well warrant a different result in the future.

Affirmed.