780 F.Supp. 628 (1991)
John DOE, Plaintiff,
v.
WASHINGTON UNIVERSITY, William Danforth, and David Bensinger, Defendants.
No. 88-2509-C (4).
United States District Court, E.D. Missouri, E.D.
October 2, 1991.
Norman S. London, Thomas F. Flynn, Law Office of Norman London, St. Louis, Mo., for plaintiff.
Leslie C. Strohm, Assoc. Gen. Counsel, School of Medicine, and Hollye Stolz Atwood, Larry M. Bauer, Bryan, Cave, McPheeters and McRoberts, St. Louis, Mo., Roderick K. Daane, Miller, Canfield, Paddock & Stone and Hooper, Hathaway, Price, Beuche & Wallace, Roderick K. Daane, Ann Arbor, Mich., for defendants.

MEMORANDUM AND ORDER
CAHILL, District Judge.
This matter comes before the Court on defendants' motion for summary judgment.
Plaintiff brings this complaint for damages pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Specifically, plaintiff alleges that his dismissal from the dental school at Washington University after the defendants' discovery that plaintiff had tested positive for human immunodeficiency virus (HIV) was discriminatory and in violation of Section *629 504. Defendants filed a motion for summary judgment on August 8, 1990, pursuant to Fed.R.Civ.P. 56(c), to which plaintiff filed a response on October 2, 1990. Defendants then filed a reply to plaintiff's brief in opposition on October 24, 1990. After careful review and consideration of all the affidavits, exhibits, and memoranda of law currently on file, the Court does now consider the merits of defendants' motion for summary judgment.

I. Factual Background.

Plaintiff John Doe was a third-year dental student at Washington University. In late March of 1988 the chairman of the Washington University Committee on AIDS (WUCA), Dr. J.A. Little, learned that John Doe was infected with human immunodeficiency virus. Acting in his capacity as chairman of the WUCA, Dr. Little brought to the attention of the Washington University Medical Center Communicable Diseases Council (WUMC-CDC)[1] the fact that an unnamed dental student had tested positive for antibodies to HIV and requested guidance from WUMC-CDC as to how the University should proceed.
The committee engaged in a lengthy discussion centering on the relevant guidelines and recommendations promulgated by the federal Centers for Disease Control (CDC).[2] An ad hoc committee was established which included the Director of the University's Student Health Services (who was the dental student's personal physician), the Director of the University's School of Dental Medicine Clinic, a University administrator, and a member of the dental school's faculty who had been personally selected by the student.
The committee met on April 19, 1988, and focused on the then current medical/scientific understanding of HIV infection and transmission, the student's strong desire to become a dentist, the large number of invasive procedures required to be performed by this student in order to complete the clinical component of the dental school's graduation requirement, and the frequency of self-injury experienced by dentists. The ad hoc subcommittee unanimously recommended to the WUMC-CDC that the student not be permitted to continue in dental school because of the risk that he could transmit HIV to patients should his hands and/or fingers be injured while performing one or more of the many invasive procedures required by the curriculum of the dental school.[3]
On May 13, 1988, the WUMC-CDC met to consider the recommendation of the ad hoc subcommittee. The WUMC-CDC considered many factors, including but not limited to the then current medical and scientific understanding of HIV infection and transmission as well as HIV transmission in relation to hepatitis B transmission.[4]
The WUMC-CDC forwarded a recommendation to the WUCA that, given the risk of transmission of HIV from an HIV-infected dental student to a patient during the performance of invasive procedures, *630 the dental student should not be allowed to engage in any invasive dental procedures. The WUCA met on May 18, 1988, to consider this recommendation. The WUCA is also a university committee composed of infectious disease experts, faculty from medicine, dental medicine, and the sciences, as well as numerous university administrators. The WUCA recommended to the School of Dental Medicine that the student not be allowed to continue to perform invasive dental procedures because of a perceived risk that, should the dental student be injured by cutting or nicking his fingers/hands in the course of invasive dental procedures, HIV might be transmitted to patients. On June 28, 1988, the WUCA reaffirmed its recommendation from the May 18, 1988 meeting.
During May and June of 1988, an ad hoc University AIDS task force composed of senior University administrators met several times to provide guidance to the dental school on how best to implement the WUCA recommendation as well as to assist the dental school in exploring ways in which the student's career objectives might still be accommodated in the event the dental school decided that the student could not satisfy the requirements for the award of the Doctor of Dental Medicine degree without continuing to perform invasive procedures.
Additionally, the task force reviewed opportunities for admission to a dental school which operated a clinic solely for HIV-infected patients.[5] Furthermore, the University offered the plaintiff admission to other related medical career programs at Washington University not requiring invasive techniques.
Finally, the dental school's Promotions Committee and its executive faculty approved the WUCA recommendation and concluded that it would not be possible for the student to satisfy the dental school's graduation requirements. The student was offered an indefinite leave of absence from the dental school, but after several months without a response the student was dismissed from the dental school. Subsequently, the student did not respond to any of the University's offers of assistance in alternative career opportunities. In November, 1988, this action was filed alleging discrimination by the University against the student in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.
In support of their motion for summary judgment, defendants argue that no issue exists as to a material fact, and, therefore, summary judgment is properly before this Court. The defendants further argue that the decision not to permit the plaintiff to continue in dental school was not arbitrary or irrational, but rather was a careful, professional, and deliberate decision based on the then currently scientific and medical opinion available. Consequently, the defendants argue that this evidence supplied ample basis to find that plaintiff posed an unacceptable risk to the health of clinical patients and thus plaintiff was not qualified to continue as a student in the dental school.
In response, plaintiff argues that there does exist an issue of material fact in dispute between the parties. Specifically, plaintiff argues that within the context of Section 504, the United States Supreme Court has required lower courts to make individualized inquiry into the impact of plaintiff's handicap upon his qualifications for the benefit or job denied, citing School Board of Nassau County v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Furthermore, plaintiff argues that judicial deference to defendants' decision to disenroll plaintiff is not appropriate and requires an individualized inquiry into the basis of the decision.
Moreover, plaintiff argues that the defendants' characterization of their decision as academic rather than medical is without merit. Plaintiff argues that the decision to exclude plaintiff was based purely upon plaintiff's infectious status and, thus, was inappropriate.

*631 II. Analysis.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." The party supporting a motion for summary judgment must demonstrate to the Court that the record before it does not disclose a genuine dispute on a material fact. Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); City of Mt. Pleasant, Iowa v. Associated Electrical Co-operative, Inc., 838 F.2d 268 (8th Cir.1988). Once the moving party has met its burden, the opponent must show the Court that there is a genuine dispute on a material issue. City of Mt. Pleasant, 838 F.2d at 274. Where the record could not lead a rational trier of facts to find for the non-moving party, there is then no "genuine issue for trial." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
Traditionally, in cases involving academic dismissal, educational institutions have the right to receive summary judgment unless there is evidence from which a jury could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance. See Ikpeazu v. University of Nebraska, 775 F.2d 250 (8th Cir.1985); see also Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). In reviewing the substance of academic decision, courts should show great deference to the opinions of educators and normally will not overturn such decisions unless they are such "a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." See Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985). The Court notes that in opposition to defendants' motion for summary judgment, plaintiff argues that defendants' decision to dismiss the plaintiff should not be characterized as academic, but as a medical decision. Consequently, plaintiff argues that such decisions that are not "academic" are inappropriate for judicial deference. The Court, however, is not persuaded by plaintiff's argument. This Court is of the opinion that, under these facts, defendants' decision to disenroll plaintiff based on plaintiff's positive HIV status was wholly an "academic" decision, not a medical decision as characterized by the plaintiff. See Bd. of Curators of the University of Missouri v. Horowitz, 435 U.S. at 91, 98 S.Ct. at 955.[6] Defendants are charged with the duty to evaluate each student as a whole. If any element of that individual severely limits his or her ability to provide competent, conscientious service, it is clearly the duty of the faculty and administration to identify these problems and pursue ameliorating alternatives.
Section 504 of the Rehabilitation Act reads in pertinent part:
No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance...." 29 U.S.C. § 794.
A handicapped individual, for use in § 504, is defined as: "[A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B).
*632 Section 504 is fully applicable to individuals who suffer from contagious diseases. See School Bd. of Nassau County v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); Chalk v. U.S. Dist. Court Cent. Dist. of California, 840 F.2d 701 (9th Cir.1988).
Under Section 504 the elements of inquiry include: (1) is plaintiff a "handicapped person" under the Act? (2) is plaintiff "otherwise qualified" for participation in the program? (3) is plaintiff being excluded from participation in the program solely because of his handicap? and (4) is the program receiving federal funding? See Doherty v. Southern College of Optometry, 862 F.2d 570 (6th Cir.1988); Pushkin v. Regents of University of Colorado, 658 F.2d 1372 (10th Cir.1981).
The Court agrees with the parties that a prime element of this inquiry is whether, in spite of his handicap, plaintiff was "otherwise qualified" to continue with his dental education.
The Supreme Court has outlined the applicable analysis necessary in the employment context for section 504 cases of a claim of discrimination on the basis of a communicable disease.
The remaining question is whether [plaintiff] is otherwise qualified for the job.... To answer this question in most cases, the District Court will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if Section 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks. (Emphasis added.)
School Bd. of Nassau County v. Arline, 480 U.S. at 287, 107 S.Ct. at 1130-31. The following factors were identified as factors to be considered:
(a) nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infections), (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities the disease will be transmitted.... Id. at 288.
These determinations must be based on "reasonable medical judgments given the state of medical knowledge" of each. Id. at 289, 107 S.Ct. at 1131.
The first of these factors, the nature of the risk, is not at issue in the case at bar. All parties acknowledge that HIV could be transmitted to a patient if the plaintiff's blood were to enter the patient's mouth accidentally. The second factor, the duration of the risk, is equally not refuted since presently there is no known cure for the HIV infected individual and plaintiff consequently will remain infectious for the remainder of his life. Nor is the third factor, the severity of the risk to third parties, at issue since HIV is the precursor to AIDS which is, for all practical purposes, 100% fatal.
The Court believes that it is the fourth factor, the probability the disease will be transmitted, that is really at issue. This area is at the heart of this country's debate surrounding HIV infected individuals, as there has been only limited study of the risk of HIV transmission from infected health-care workers to patients. Although since the filing of this lawsuit a number of cases have been publicized that indicate the realistic possibility of transmission of HIV from an infected health care worker to a patient, there is no nationwide consensus on the precise probability that an HIV-infected dental student will transmit HIV to a patient. Defendant argues that when faced with an HIV-infected individual who desires to continue to perform invasive procedures, the decision maker(s) can only make the best informed, reasoned judgment which balances the interests of the individual against the interests of his patients.
In Chalk, the Court noted that it must weigh the interests between the parties and the difficulties "... which confront a handicapped person, an employer, and the public in dealing with the possibility of contagion in the workplace. The problem *633 is in reconciling the needs for protection of other persons, continuation of the work mission, and reasonable accommodation  if possible  of the afflicted individual." Chalk, 840 F.2d at 705.
The parties have submitted evidence to this Court which includes many articles from prestigious medical journals, affidavits, and deposition testimony, as well as guidelines from the U.S. Department of Health and Human Services and the Center for Disease Control. These submissions reveal an overwhelming consensus of medical and scientific opinion regarding the nature and transmission of AIDS. All parties agree that clinical treatment can bring the dental student into contact with a patient's blood and tissue and AIDS can be transmitted through contact with an infected person's blood or other bodily fluids. The CDC has reported in an article titled Recommendation for Preventing Transmission of Infection with Human T-Lymphotropic Virus Type III/Lymphadenopathy Associated Virus in the Workplace, (MMWR 1985, 34:691) that:
.... a risk of transmission of HTLV-III/LAV [early name for HIV] infection from HCWS [health care workers] to patients would exist in situations where there is both (1) a high degree of trauma to the patient that would provide a portal of entry for the virus (e.g., during invasive procedures), and (2) access of blood or serous fluid from the infected HCW to the open tissue of a patient, as could occur if the HCW sustains a needle stick or scalpel injury during an invasive procedure.
Furthermore, during the performance of dental procedures, trauma to dental workers' hands is common. The CDC in an article entitled Update: Universal Precautions for Prevention of Transmission of Human Immunodeficiency Virus, Hepatitis B Virus, and other Blood Borne Pathogens in Health-Care Settings, MMWR 1988; 37 (WO.24):379, stated that:
During dental procedures, contamination of saliva with blood is predictable, trauma to health-care workers' hands is common, and blood spattering may occur.
Furthermore, the CDC has determined that the use of gloves as a protective barrier during the performance of invasive dental procedures should reduce the risk of exposure of a dental worker's skin and mucous membranes to potentially infective materials from a patient, but the use of gloves cannot prevent penetrating injuries to the dental worker's hands caused by needles, other sharp instruments, or patient bites. Moreover, clinical training in invasive procedures is critical to completion of the third and fourth years of the dental school curriculum. In order to satisfy this requirement the plaintiff needed to complete, at a minimum, an additional 1,021 clinical procedure hours.[7]
The parties acquiesce that the transmission of HIV from plaintiff to his patients is a low but existent risk, not now capable of precise measure. Plaintiff asserts, however, that if proper barrier techniques are used an HIV-infected doctor or dentist presents no threat of infecting his patients.[8] This absolute is refuted in the light of the Bergalis tragedy in which a Florida dentist infected five of his patients with the same virus/strain of AIDS that caused the dentist's death. The Court is convinced that although the risk of transmission of HIV from an infected dental worker to a patient may be minimal, there is still some risk of transmission.
It is the stated goal of the medical profession to heal, and its secondary axiom, if healing is not possible, is not to harm. To permit even an occasional death to occur because of a failure to scrupulously guard *634 the safety of patients would appear to be morally unacceptable and contrary to the fiduciary responsibilities of the medical profession. While doctors emphasize that the danger, statistically, is slight, the victim of infection by this rare but fatal infection can hardly be consoled by the odds. The public clearly believes that because of the uncertainty of today's medical knowledge, HIV-positive health care workers should not perform invasive medical or dental procedures. The Court does not, however, have to reach this conclusion; the issue before this Court is the narrow question of whether the academic decision by the University officials was properly decided.
Therefore, the only remaining question before this Court is whether the record shows that the University acted arbitrarily in dismissing plaintiff from the dental school without permitting completion of the required clinical phase. See Regents of the University of Michigan v. Ewing, 474 U.S. at 225, 106 S.Ct. at 513 (1985). Plaintiff alleges in his complaint that his dismissal was arbitrary and irrational and was unsupported by reasonable medical or scientific opinion or evidence.
Rule 56(c) requires summary judgment to be entered when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
Nothing in the record before this Court indicates that the University's decision was based on stereotypes or prejudices about individuals with HIV. In point of fact, the University extended opportunities to the plaintiff to further his medical career by offering alternative programs not requiring invasive techniques. This was commendable. The University's decision focused on the potential of possible exposure of HIV to third parties. The University, with the aid of more than 40 professionals, 33 of whom were from the medical field, considered all current relevant medical information available while balancing the rights of the plaintiff against the rights of his patients.
A university empowered with the special responsibility of a teaching medical school has an inherent obligation to do no harm to those least able to protect themselves. Most of the persons utilizing the services and skills of the dental clinic rely heavily on the wisdom and experience of the University faculty. After all, these patients do not have a choice or selection of dental technicians. They must rely upon the supervisor of the faculty and administrator of the university  and indeed, the reputation and esteem of that university is always at risk if it favors a students' needs more than those of the patients. The university must proceed with due care and caution, always regarding the rights of individuals as human beings more than the recognition of academic rank or professional prestige.
The Court in Arline noted that ... "a person who poses a significant risk of communicating an infectious disease will not be otherwise qualified for his or her job if reasonable accommodations will not eliminate that risk." Arline, 107 S.Ct. at 1131 (n. 16). "[I]t would be unreasonable to infer that Congress intended to force institutions to accept or readmit persons who pose a significant risk of harm to themselves or others." See Doe v. New York University, 666 F.2d 761 (2d Cir.1981). So, too, in the case at bar, this Court believes that the circumstances surrounding plaintiff's HIV status presented little alternative to those charged with evaluating plaintiff's ability to qualify as a dental student.
Furthermore, nothing in the language or history of § 504 indicates an intention to limit the ability of an educational institution from requiring reasonable physical qualifications for participation in a clinical training program. Southeastern Community College v. Davis, 442 U.S. 397, 414, 99 S.Ct. 2361, 2371, 60 L.Ed.2d 980 (1979); see also Monahan v. State of Nebraska, 687 F.2d 1164 (8th Cir.1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 *635 (1983). Consequently, plaintiff has failed to establish that he was "otherwise qualified" for participation in the program. Accordingly, defendant's motion for summary judgment on plaintiff's complaint must be and is granted.
NOTES
[1] WUMC-CDC is a multi-disciplinary group established to advise the Washington University Medical Center and its member institutions on policies to be adopted to deal with communicable diseases. It is composed of eight physicians and one nurse, each of whom specializes in infectious diseases, plus one physician in a general practice, three nurses in hospital administration, one microbiologist, and two university administrators.
[2] The CDC's 1987 Recommendations for Prevention of HIV Transmission in Health-Care Settings, MMWR 1987; (Suppl. No. 2S), states that decisions concerning whether a health-care worker infected with HIV  especially a worker performing invasive procedures  can adequately and safely continue to perform patient-care duties or whether the worker's work assignments should be changed are decisions to be made by the health-care worker's personal physician in conjunction with the medical directors and personnel health service staff of the employing institution or hospital.
[3] In order to satisfy the dental school's graduation requirements, a student at Washington University would need to complete at a minimum some 1,643 clinical procedure hours and demonstrate a level of proficiency in each of a number of clinical disciplines.
[4] HIV and hepatitis B are transmitted in the same manner and transmission of hepatitis B from a dental worker to patients is well documented. Both are transmitted by percutaneous contact (via an open wound, nonintact skin, or mucous membranes) with infected blood or blood-contaminated body fluids.
[5] Unfortunately the Washington University faculty found that the dental school with the clinic for HIV-infected patients did not have sufficient diversity within its patient pool to enable the plaintiff to complete his clinical requirements.
[6] Mr. Chief Justice Rehnquist went on to note that "... personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness." Horowitz 435 U.S. at 91, n. 6, 98 S.Ct. at 955, n. 6.
[7] Prior to defendants' decision to terminate plaintiffs clinical program, plaintiff had already completed some 431 clinical hours of required training.
[8] The Court notes that since the initiation of plaintiff's action, the Centers for Disease Control have reported what appears to be the first documented case of transmission of HIV from a dentist to a patient during an invasive dental procedure. Subsequently, multiple cases of possible transmission of HIV in similar situations have been reported. See Possible Transmission of Human Immunodeficiency Virus to a Patient During an Invasive Dental Procedure. MMWR 1990; 39 (No. 29) 4389,491.