**Richard ROE, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, Defendant.**

**Civ. A. No. 93–0164 (JHG).**

United States District Court,
District of Columbia.

Dec. 21, 1993.

As Amended Feb. 16, 1994.

Douglas B. Mishkin, McKenna & Cuneo, and Joseph M. Sellers, Washington Lawyers' Committee for Civil Rights Under Law, Washington, DC, for plaintiff.

Rena Schild and Karen Maniscalco, Asst. Corp. Counsel, Washington, DC, for defendant.

### *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge. [M]yths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.

*School Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) (footnotes omitted). These sentiments recognized by Congress when drafting the Rehabilitation Act of 1973 and echoed more than a decade after passage of that Act by the United States Supreme Court still resonate today despite the strides taken by this country to eliminate the detrimental effects of unfounded discrimination.

Today, both the Hepatitis B Virus ("HBV") and the Human Immunodeficiency Virus ("HIV") generate a significant portion of Rehabilitation Act caselaw. This case falls within that growing segment of discrimination caselaw and examines the boundaries between permissible discrimination against an individual infected with a contagious disease, that founded on well-supported medical evidence of a threat to others, and impermissible discrimination, that based on unfounded fears, myths, and speculation.

In the instant case, plaintiff Richard Roe ("Roe"), a District of Columbia ("defendant" or "the District") firefighter infected with HBV, alleges that the defendant's refusal to permit him to work from January 6, 1991 to October 14, 1992 violated both the Rehabilitation Act of 1973, codified at 29 U.S.C. §§ 701 et seq. and 42 U.S.C. § 1983.[1] Because the parties entered a partial settlement, including, inter alia, a payment to Roe for settlement of all of his claims but one, the only issue that remained to be resolved at trial was

> whether defendant may restrict plaintiff's performance of his duties because of plaintiff's Hepatitis B status. Specifically, defendant currently restricts plaintiff from performing mouth-to-mouth resuscitation, i.e., without the use of mechanical equipment, because of his Hepatitis B status unless no one else is available to perform the resuscitation.

Stipulation of Partial Settlement, December 3, 1993.

## I. FINDINGS OF FACT

### A. The Hepatitis B Virus.

The Hepatitis B Virus ("HBV") is a highly contagious infection that affects the liver.[2] Its presence can be detected through blood tests that measure antigens and antibodies.[3]

In the general population, approximately 20 out of 100,000 persons are infected with HBV, however, in subpopulations such as health care workers, intravenous drug users, and homosexual men, that rate is higher. The mortality rate for HBV is one-tenth of one percent.[4] Also, liver inflammation and liver cancer can be caused by HBV.

A person in the early stages of HBV may suffer fever, muscle aches and joint pains—symptoms akin to the flu. Later, jaundice may occur. Individuals with these symptoms are considered infected with "acute" hepatitis. However, due to the similarity of HBV symptoms with other more common and less serious illnesses, individuals infected with acute HBV often do not realize they have contacted HBV. It is estimated that two-thirds of those who develop HBV do not have any symptoms or have symptoms which go unnoticed.

Later, as the illness progresses and the liver heals, any symptoms associated with the acute stage of HBV disappear. At this stage, a minority of those infected become chronic carriers of the virus. Chronic carriers display no symptoms and are often unaware that they are carriers. Their status can be determined by finding present in their blood, the "E antigen" or the "surface antigen," antigens found during the early stages of HBV. If an individual carries these antigens for more than six months, that person is deemed a chronic carrier of HBV and can transmit the virus. Only five percent of those infected with HBV become chronic carriers.

### B. Transmission of the Hepatitis B Virus.

#### 1. HBV Transmission Studies.

Three expert witnesses[5] testified regarding the modes of transmission of HBV. Be-

---

1. The 42 U.S.C. § 1983 claim was dismissed during trial on motion of the defendant and consent of the plaintiff.

2. The medical community has been studying HBV and its transmission for approximately thirty years.

3. At the early stage of HBV infection, during incubation, it is possible to perform a test for HBV yet receive a negative result—a "false negative."

4. Because of similarities, the transmission of HBV is often compared to HIV transmission, however, HIV carries a 100% mortality rate.

5. Dr. David M. Parenti, Katherine H. West, and Dr. Phillip F. Pierce.

cause the qualifications of all three experts are uncontroverted, it is unnecessary to recapitulate their long and distinguished *curriculum vitae. See generally* Plaintiff's Exhibits 1, 9; Defendant's Exhibit 2. As a preliminary matter, it should be noted that the experts did not disagree as to which are the relevant studies and their authority; disagreement only arose in interpreting the uncontroverted studies and applying them to the District of Columbia's restriction on Mr. Roe's position as a firefighter.

All three agree that HBV is principally transmitted through the exchange of bodily fluids, from mother to child, and through sexual conduct. The two most prevalent types of transmission are through blood and through sexual activity, specifically, semen/vaginal transmissions. Other bodily fluids such as tears and saliva also contain HBV.[6] Nonetheless, there have been no reported cases of transmission of HBV by saliva.[7]

Because it is only possible to study human transmission of HBV through "look back" studies, studies compiled after it is known that an individual was infected with HBV and was in an environment where that individual might have transmitted the infection to others, the only non-"look back" studies have involved gibbons, not humans. In one particular study, published in 1980, saliva containing HBV was orally administered to gibbons. The saliva was administered utilizing two methods: in the first, the HBV-infected saliva was administered without trauma causing bleeding; in the second, HBV-infected saliva was administered with a toothbrush to induce some bleeding. Regardless of whether bleeding was induced or not, none of the gibbons developed HBV from oral salivary transmission. *See* Plaintiff's Exhibit 3 ("Experimental Transmission of Hepatitis B Virus by Semen and Saliva").

The only other studies of salivary transmission of HBV have been "look back" studies. Several studies have been conducted of individuals who have used CPR training manikins contaminated by saliva from a fellow participant later learned to be infected with HBV. In a 1985 study, although one of the CPR training participants was infected with HBV, none of the other participants became infected with HBV as a result of using the same manikins. *See* Plaintiff's Exhibit 4 ("Hepatitis B Virus in a Cardiopulmonary Resuscitation Training Course"). Another "look back" study examined a music teacher infected by HBV who had shared instruments, including reed instruments, with his junior high school students. After follow-up testing, it was determined that no transmission resulted from sharing instruments with the HBV-infected teacher.

Although no study has documented salivary transmission of HBV, there have been unexplained transmissions of HBV. For example, in 1989, an article was published that examined the transmission of HBV that occurred in households containing a chronic carrier of HBV. That study was unable to explain why some transmissions occur in households and classrooms with young children. *See* Plaintiff's Exhibit 6 ("Horizontal Transmission of Hepatitis B Virus"). Another article studied an extended family living in Alabama, multiple members of which had contacted the infection from a family member. *See* Plaintiff's Exhibit 7 ("Hepatitis B in an Extended Family—Alabama").[8] Neither study could establish that saliva caused transmission of the infection. In the studies,

---

6. Blood contains from 100 times to 1,000 times greater amounts of HBV than does saliva.

7. HBV can likely be transmitted by saliva containing large amounts of blood, but if so, that transmission is considered a blood transmission. HBV has also been transmitted in gibbons through injections of infected saliva, however, this is considered an inoculation transmission.

8. There has been one documented case of transmission of HBV through a human bite. *See* Plaintiff's Exhibit 12 ("Hepatitis B Transmitted by a Human Bite"). However, that article described the transmission as an inoculation transmission, not a salivary transmission.

Ms. West opined that if Roe were bleeding he would be unable to perform mouth-to-mouth resuscitation because he would be unable to move air into the patient's mouth. She does not believe that there is any significant risk of biting occurring during CPR since the firefighter's mouth must be opened very widely in order to cover the patient's mouth and nose, and thus the resuscitator's teeth do not come together.

salivary transmission was merely a theory advanced to explain what was, and still is, inexplicable.

Despite the fact that all of the experts agree that there has yet to be a documented case of salivary transmission, Dr. Parenti and Dr. Pierce draw different conclusions from the horizontal transmission studies. According to Dr. Parenti, because saliva cannot definitely be implicated in these unexplained transmissions, the risk of salivary transmissions is nothing more than theoretical. Neither he nor Ms. West recommends that individuals be concerned with possible salivary transmissions, such as those through "deep" kissing. In contrast, relying on the articles regarding horizontal transmission of HBV and the undisputed presence of HBV in saliva, Dr. Pierce believes that there is a risk of transmission of HBV by mouth-to-mouth resuscitation. As a result of this belief, he does counsel his patients against saliva exchanges such as "deep" kisses.

2. *The Centers for Disease Control Guidelines.*

The Centers for Disease Control ("CDC") have been studying transmission of HBV since the 1950's. In a 1988 update to guidelines published by the CDC, captioned "Update: Universal Precautions for Prevention of Transmission of Human Immunodeficiency Virus, Hepatitis B Virus, and Other Bloodborne Pathogens in Health–Care Settings," the CDC discusses "universal precautions"—those precautions intended to prevent parenteral, mucous membrane, and noninteract skin exposure of health-care workers to bloodborne pathogens. In discussing the body fluids to which universal precautions apply and do not apply, the CDC expressly exempts saliva (except in dentistry) from the list of fluids to which the precautions apply. The CDC states that general infection control practices already in existence minimalize *"the minute risk, if any,* for salivary transmission of … HBV." Plaintiff's Exhibit 10, at 379 (emphasis added).

In February 1989, the CDC published its "Guidelines for Prevention of Transmission of Human Immunodeficiency Virus and Hep-

atitis B Virus to Health–Care and Public–Safety Workers." *See* Plaintiff's Exhibit 11. That document notes that:

> No transmission of HBV or HIV infection during mouth-to-mouth resuscitation has been documented. However, because of the risk of salivary transmission of *other* infectious diseases … and the *theoretical risk* of HIV and HBV transmission during artificial ventilation of trauma victims, disposable airway equipment or resuscitation bags should be used.

*Id.*, at 11 (emphasis added). Because this publication deals most directly with firefighters, Ms. West believes that it is the most applicable to Roe and does not require the restriction currently imposed upon Roe.[9]

## C. Richard Roe and the District of Columbia Fire Department.

1. *The District of Columbia Fire Department.*

The District of Columbia does not routinely test its firefighters, either incumbent firefighters or applicants, for HBV. Nor does the District intend to do so in the future. Recently, however, the District began to offer a purely *voluntary* immunization program. When questioned why it does not, in addition to offering immunization, routinely test all firefighters, the District responded that it was not cost effective to do so. As a consequence, it is possible that the District currently employs firefighters other than Roe infected with HBV. Nevertheless, Roe is the only District of Columbia firefighter restricted from performing mouth-to-mouth resuscitation.

Like the District of Columbia, no other fire department in the nation tests its employees for HBV. On the other hand, in marked contrast to the District, no other department in the United States restricts known HBV carriers from performing particular duties. In fact, fire departments in New York, California, Georgia, Florida, Virginia, and New Jersey all employ at least one firefighter known to be infected with HBV. Ms. West, plaintiff's expert on infection control, has

---

9. Dr. Pierce agreed that the 1989 CDC guidelines essentially state that in an ideal world all people should use the resuscitory equipment detailed by the CDC, however, such use is not essential.

consulted with all of these fire departments and has recommended, and her advice has been taken, that the individuals not be restricted in any way.[10]

In addition, there have been no reported firefighter to firefighter transmissions of HBV nor have there been any incidents of transmission of HBV by firefighters to the public. The District's expert, Dr. Pierce, estimated that mouth-to-mouth resuscitation has been performed approximately 1,000 times by HBV-infected individuals, yet there have been no known transmissions.

### 2. *Richard Roe.*

Richard Roe has been a District of Columbia firefighter since July 1985. Roe was hired after he passed the routine physical examination which did not involve a test for HBV, nor questioning regarding HBV. Five months after being hired, Roe learned that he was a chronic carrier of HBV. Despite this status, he has since passed each annual physical examination.[11] Because he felt his infection was a private matter and because he wished to protect his privacy and that of his family, Roe did not inform the fire department when he tested positive for HBV. Nonetheless, the department subsequently learned of Roe's status.

As a firefighter, Roe was taught cardiopulmonary resuscitation ("CPR"). As part of his training, he was advised to first attempt to perform CPR with a mechanical resuscitator, one of which is carried on each fire engine or other apparatus. If a mechanical resuscitator is unavailable, each firefighter is next instructed to use his or her pocket mask (issued as standard equipment to each fire-

fighter). Only if neither of these methods is available, is mouth-to-mouth resuscitation performed as the method of last resort.

Currently, Roe works on a truck that responds to calls with three other people. Since 1985, Roe has performed CPR approximately 100 times.[12] Roe is concerned about the restriction on performing mouth-to-mouth resuscitation because he has received no advice on its implementation and because any delay in beginning CPR can result in brain damage or death.[13] He also believes he is the subject of unfounded discrimination and is concerned that if the restriction continues, his co-workers will become aware of his HBV status and ostracize him as a result.

### 3. *The Experts' Opinions Regarding Roe's Restriction.*

Ms. West and Dr. Parenti both believe the restriction currently in place that prevents Roe from performing mouth-to-mouth resuscitation unless there is no one else available is neither necessary nor supportable by the medical evidence (or lack thereof) of salivary transmission of HBV. Only Dr. Pierce finds such a restriction warranted.

Ms. West stated that there is no measurable or significant risk of transmission by Roe during mouth-to-mouth resuscitation. Therefore, in her opinion, Roe does not pose a direct threat to others. Dr. Parenti classifies the risk of HBV salivary transmission through mouth-to-mouth resuscitation as a theoretical risk or a very, very small risk. As a medical professional, Dr. Parenti candidly admitted that he does not feel comfortable stating that there is absolutely no risk,

---

**10.** Neither the George Washington nor Georgetown Hospitals, the two hospitals at which Doctors Parenti and Pierce work, place restrictions on health care workers carrying HBV. Nor does either institution routinely test its health care workers for HBV.

**11.** In addition to being a firefighter, Roe received his Emergency Medical Technician certification in 1987. That certification lapsed during the period of time the District of Columbia did not permit him to work as a firefighter due to his HBV status.

**12.** The District of Columbia responds to approximately 800 cardiac arrests each year. Broken down by the number of firefighters employed by the city signifies that, on average, each firefighter

must perform CPR approximately 1.5 times a year. Of the hundreds of times that CPR is performed, actual mouth-to-mouth resuscitation is very rare. Generally, either the mechanical resuscitator or the pocket mask is used.

There was no testimony explaining why Roe has performed CPR at a rate much greater than that of the average firefighter. The Court can only surmise that Roe's rate was higher due to his EMT certification.

**13.** Ms. West stated that Roe's restriction is impractical. Delayed response to a victim in cardiac arrest may lead to greater damage and also to the death of the patient.

however, he does feel that any risk is remote. In his opinion, if the risk were significant, there would be reported cases of salivary transmission. He testified that the risk of Roe transmitting HBV to a member of the public through mouth-to-mouth resuscitation does not pose a significant risk or a direct threat to the health of the public.[14]

Like Dr. Parenti and Ms. West, Dr. Pierce considers that the risk of salivary transmission of HBV is "very low." However, Dr. Pierce does not categorize the risk as only theoretical. In his view, although there may be a low risk of infection, if infected, there is high risk of a life-long problem. As a consequence, Dr. Pierce recommends that Roe should be precluded from doing mouth-to-mouth resuscitation. Interestingly, Dr. Pierce does not believe that the District of Columbia Fire Department should institute routine testing even though there is the possibility that it employs other HBV carriers.

## II. CONCLUSIONS OF LAW

Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

The issues in dispute in the instant case are whether plaintiff is an individual with a handicap, and if so, whether he is "otherwise qualified" or whether he is excluded from coverage because he is

> an individual who has a currently contagious disease or infection and who, by reason of such disease or infection would constitute a direct threat to the health or safety of other individuals or who, by reason of the currently contagious disease or

infection, is unable to perform the duties of the job.

29 U.S.C. § 706(8)(D).

### A. Individual With a Handicap.

■ Although the District contests that Doe is an individual with a handicap, that argument is meritless. The Rehabilitation Act defines an "individual with a disability" as a person who:

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment or, (iii) is regarded as having such an impairment.

29 U.S.C. § 706(8)(B). Since Roe certainly has been treated by the District of Columbia as if he has an impairment, it is unnecessary to discuss each of the three alternative statutory definitions. Prior to reinstating Roe in October 1992, the District of Columbia refused to allow Roe to work due to his HBV status. Now, although he may again work as a firefighter, Roe is prevented from performing a significant duty—mouth-to-mouth resuscitation. As the District concedes, the only reason the restriction exists is because Roe is infected with HBV. *See Harris v. Thigpen*, 941 F.2d 1495, 1524 (11th Cir.1991) (treating individuals differently because they have HIV, regardless of whether such treatment is justifiable, signifies that the individual is regarded as having a handicap). The defendant's argument that Roe is not regarded as having an impairment is difficult to understand and impossible to accept.

### B. Direct Threat Exemption.

■ To establish a *prima facie* case that he is not exempted from coverage, Roe must demonstrate that he is "otherwise qualified" to perform mouth-to-mouth resuscitation and has been deprived of his ability to do so solely on the basis of his HBV condition. *See Pushkin v. Regents of Univ. of Colorado*, 658 F.2d 1372, 1387 (10th Cir.1981); *Doe v. District of Columbia*, 796 F.Supp. 559, 567–68 (D.D.C.1992). An otherwise qualified person is "one who is able to meet all of a program's

---

14. Because the risk is so slight, Dr. Parenti does not recommend that the District test its firefighters for HBV.

requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). Whether Roe can do so, or whether Roe is not an "otherwise qualified" individual because his contagious disease poses a direct threat to others, depends on

(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987);[15] *see also Bradley v. University of Texas M.D. Anderson Cancer Ctr.,* 3 F.3d 922, 924 (5th Cir.1993); *Kohl v. Woodhaven Learning Ctr.,* 865 F.2d 930, 936 (8th Cir.), *cert. denied,* 493 U.S. 892, 110 S.Ct. 239, 107 L.Ed.2d 189 (1989); *Doe v. District of Columbia,* 796 F.Supp. at 567–68; *Doe v. Washington Univ.,* 780 F.Supp. 628, 632 (E.D.Mo.1991). Once Roe has established a *prima facie* case of discrimination, the burden shifts to the District of Columbia to demonstrate that Roe is not otherwise qualified to perform mouth-to-mouth resuscitation or that Roe has been restricted for a reason other than his handicap. *See id.*

■ In the instant case, analysis of the first and fourth *Arline* factors is inextricably intertwined. The undisputed evidence demonstrates that there is no scientific evidence that HBV has ever been transmitted by saliva. Indeed, all three experts agreed that in thirty years of studying the virus, there has not been one reported case of salivary HBV transmission. Dr. Pierce, the defendant's expert, recognized that mouth-to-mouth resuscitation has been performed approximately 1,000 times by individuals infected with HBV, without transmission of the virus. In the face of this uncontroverted evidence, both Dr. Parenti and Ms. West state that the risk is only "theoretical." Even Dr. Pierce categorizes the risk of transmission as "very

low." In addition to these experts' opinions, the CDC, an authoritative and well-respected body, does not consider the risk of salivary transmission of HBV as anything more than theoretical. Consequently, the CDC does not classify saliva as a fluid to which universal precautions should be applied.

Even more telling than the lack of any reported cases of salivary transmission and Dr. Parenti and Ms. West's characterization of the risk involved is the fact that the District of Columbia Fire Department does *not* test its firefighters for HBV. Nor does the District of Columbia intend to do so despite the fact that it is entirely conceivable and perhaps even probable that other firefighters, now on active duty in the District, are currently infected with HBV but nonetheless authorized to administer mouth-to-mouth resuscitation. After conducting a cost-benefit analysis, the District determined that testing was not worth the cost it would impose. In fact, Dr. Pierce, defendant's expert, does not himself recommend testing the District's firefighters. Nor does he recommend that health care workers at the Georgetown University Hospital, the institution with which he works, be tested for HBV. So, the experts agree: HBV testing is unnecessary. The argument that even though it is not cost-effective or necessary to test firefighters for HBV, and even though there may well be other firefighters infected with HBV who do perform mouth-to-mouth resuscitation, *only* Roe need be restricted is so internally inconsistent, it cannot be reconciled with common sense, nationwide application and medical science. The conclusion is evident: Neither a direct threat nor significant risk exists in allowing a firefighter like Richard Roe to perform mouth-to-mouth resuscitation.

In a similar case involving the risk of transmission of HBV by learning disabled children infected with HBV, the Second Circuit noted that:

The lack of any evidence that a serious possibility of transmittal existed is underscored by the [defendant's] own failure to

---

**15.** Although these factors were articulated in *Arline,* a Supreme Court case decided prior to the 1988 amendment addressing contagious diseases, the phrases "significant risk" and "direct threat" are sufficiently similar to merit a similar analysis. Other courts have applied the *Arline* framework and the District of Columbia has not opposed use of this logical four-factor approach.

make any comprehensive plan based on its own assessment of the situation. Specifically, the [defendant] made no effort to identify all the children in the public schools, or even all the retarded children in the public schools who might be carriers of hepatitis B. Instead it merely tested the 450 children who happened to be in classrooms that included known Hepatitis B carriers, a policy that casts doubt on the [defendant's] sense of how critical the problem was.

*New York State Ass'n for Retarded Children, Inc. v. Carey*, 612 F.2d 644, 650 (2d Cir.1979). Like this Court, the Second Circuit was unpersuaded by the defendant's inability to "demonstrate that the health hazard posed by the hepatitis B carrier children was anything more than a remote possibility." *Id.*

In sum, because there have been no documented cases of salivary transmission of HBV in thirty years of study, the nature of the risk and the probabilities that HBV will be transmitted by Roe through mouth-to-mouth resuscitation are theoretical only. As the Ninth Circuit has held: "Little in science can be proved with complete certainty, and section 504 does not require such a test." *Chalk v. United States Dist. Court for the Cent. Dist. of California*, 840 F.2d 701, 707 (9th Cir.1988). Resort to speculation for which there is no credible support is impermissible. *Id.* at 708. Or, in other words, it is "error to require that every theoretical possibility of harm be disproved." *Id.* at 709. Roe need not disprove the merely theoretical here.

Because the nature of the risk and the probability that HBV will be transmitted are both so low as to be classified as theoretical, the importance of the second and third *Arline* factors, although meriting some discussion, fades. Despite the minuteness of the risk of salivary transmission of HBV, the risk is of permanent duration: Roe is a chronic carrier of HBV, accordingly, the potential risk of transmission will not disappear over time. In terms of the severity of the risk, HBV carries a significantly lower mortality rate than does HIV—one tenth of one percent. Yet, HBV can cause liver damage, including cancer, and even death. Further-

more, if a person becomes a chronic carrier of the infection, that person will have to change his or her lifestyle so as not to infect others, *inter alia*, through sexual conduct.

Nonetheless, all four factors balance heavily in Roe's favor. The overwhelming evidence that HBV is not transmitted through saliva, the permanent duration of the risk of transmission and the severity of the risk, do not support a finding that Roe's restriction is warranted.

Roe clearly established a *prima facie* case of discrimination. The defendant does not argue that Roe is not "otherwise qualified" to perform all of the duties of a firefighter, including mouth-to-mouth resuscitation. He has passed all of his annual physicals, confirmation that he is qualified to perform all of his firefighter duties. Further, he was, at one time, certified as an Emergency Medical Technician, a certification above that necessary to be a District of Columbia firefighter.

The District of Columbia, to whom the burden shifted, cannot, in the face of all three experts' testimony, demonstrate that Roe's performing mouth-to-mouth resuscitation poses a direct threat to the health and safety of others. Moreover, the District candidly admits that the restriction was imposed on Roe due to his HBV status and cannot show that Roe has been treated differently for any reason other than his handicap.

In light of uncontradicted scientific *evidence*, the District of Columbia has harkened to unfounded fears and, by doing so, has violated the Rehabilitation Act of 1973.

## III.  CONCLUSION

Accordingly, for the reasons stated above, it is hereby

ORDERED that the restriction of the District of Columbia on Richard Roe's performance of mouth-to-mouth resuscitation because of his Hepatitis B status violates the Rehabilitation Act;  it is

FURTHER ORDERED that the District of Columbia is enjoined from imposing any restriction on Richard Roe's duties as a firefighter based on his Hepatitis B status;  it is

FURTHER ORDERED that should plaintiff intend to pursue a claim for attorneys' fees and costs incurred after October 26, 1993, that petition must be filed no later than January 10, 1994; the opposition is due by January 24, 1994; and, the reply, if any, must be filed by January 31, 1994.

IT IS SO ORDERED.

### *JUDGMENT*

In accordance with the Memorandum Opinion and Order issued this date, judgment is entered in favor of plaintiff Richard Roe and against defendant District of Columbia.

IT IS SO ORDERED.