### Sidney ABBOTT, Plaintiff,

### v.

### Randon BRAGDON, D.M.D., Defendant.

### Civ. No. 94–0273–B.

United States District Court,
D. Maine.

Dec. 22, 1995.

582

Bennett H. Klein, Gay & Lesbian Advocates & Defenders, Aids Law Project, Boston, MA, David G. Webbert, Law Offices of Philip Johnson, Esq., Augusta, Maine, for Plaintiff.

Charles E. Gilbert, III, Gilbert Law Offices, P.A., Bangor, Maine, John W. McCarthy, Rudman & Winchell, Bangor, Maine, for Defendant.

John E. Carnes, Augusta, Maine, for Maine Intervenor Plaintiffs.

James M. Moore, U.S. Attorney's Office, Bangor, Maine, John L. Wodatch, U.S. Department of Justice, Disability Rights Section Civil Rights Division, Washington, D.C., for USA Intervenor Plaintiff.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Sidney Abbott, an individual with Human Immunodeficiency Virus ("HIV") filed this action against Defendant Randon

Bragdon, a dentist with a practice in Bangor, Maine. Plaintiff's Amended Complaint alleges violations of title III of the Americans with Disabilities Act ("ADA" or "title III") and the Maine Human Rights Act ("MHRA") based on Defendant's refusal of treatment in his office. Defendant offered alternative treatment to Plaintiff in a hospital setting. Plaintiff seeks injunctive and declaratory relief under the ADA and MHRA, and civil penal damages under the MHRA. Both the United States ("Government") and the Maine Human Rights Commission ("MHRC") have intervened as Plaintiffs, and all Parties have moved for Summary Judgment. For the following reasons, the Court grants Summary Judgment for Plaintiff, and denies Summary Judgment for Defendant.

### Background

The undisputed facts are as follows. Plaintiff Sidney Abbott has been infected with HIV for the past nine years. HIV is a retrovirus which causes Acquired Immune Deficiency Syndrome ("AIDS"). People exposed to HIV may contract the virus, and if so, will develop HIV antibodies and become HIV positive. HIV positive status does not equate with manifest illness. Individuals may carry HIV for several years without manifesting the collection of symptoms known as AIDS. During that period, the HIV carrier remains asymptomatic, meaning apparently healthy and generally able to participate in day to day life. Even in the asymptomatic phase, however, the HIV carrier's blood remains infected with a multiplying virus that creates abnormalities in that person's blood and lymphatic systems. To date, Plaintiff remains asymptomatic.

Defendant, Randon Bragdon, a dentist licensed to practice in the state of Maine, has operated a dental practice in Bangor since 1978. In September of 1994, Plaintiff arrived at Defendant's office for a pre-scheduled dental appointment. On her Patient Registration and Health Record form, Plaintiff indicated that she had HIV. Defendant examined Plaintiff and diagnosed a cavity. Defendant informed Plaintiff that pursuant to his infectious disease policy, he would not fill her cavity in his office, but would be glad to treat her in a hospital setting. Defendant then told Plaintiff that he would charge her the standard fee for filling a cavity as well as what the hospital charged for use of its facilities.

With respect to the ADA, the Parties dispute (1) whether Plaintiff's asymptomatic HIV constitutes a disability under the statute, and (2) whether treatment of Plaintiff in Defendant's office poses a direct threat to the health and safety of others such that Defendant may lawfully refuse such treatment. With respect to the MHRA, the Parties dispute whether Defendant's office constitutes a place of public accommodation. Finally, Defendant challenges the ADA on various constitutional grounds.

### Discussion

#### A. Summary Judgment

Courts properly grant summary judgment when the moving party demonstrates the absence of a genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party may rely on deposition testimony, answers to interrogatories, admissions on file and affidavits to meet its burden. *Id.* In addition the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of a claim for which the nonmoving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the nonmoving party need only present evidence from which a jury might return a verdict in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmoving party, however, may not rest on mere allegations or denials, but must employ affidavits, admissions, deposition testimony and answers to interrogatories to set forth specific facts establishing a genuine issue for trial. Fed.R.Civ.P. 56(e).

#### B. ADA

Under title III, a place of public accommodation may not discriminate against an individual on the basis of a disability in the full and equal enjoyment of services. 42

U.S.C. § 12182(a). Places of public accommodation, however, may deny full and equal enjoyment of services to an individual who poses a direct threat to the health or safety of others. 42 U.S.C. § 12182(b)(3). To find a violation of title III, therefore, the Court must determine that (1) Defendant's office constitutes a place of public accommodation, (2) Plaintiff has a disability for purposes of the ADA, and (3) treatment of Plaintiff in Defendant's office does not pose a direct threat to the health or safety of others. Defendant does not dispute that his office constitutes a place of public accommodation under the ADA.[1] The Court also concludes that Plaintiff is disabled as a matter of law, and that treatment of Plaintiff in Defendant's office poses no direct threat to the health and safety of others.

*1. Plaintiff is Disabled as a Matter of Law*

■ Title III of the ADA prohibits a place of public accommodation from discriminating in equal use of services on the basis of disability. Under the ADA, disability means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Defendant contends that asymptomatic HIV does not constitute a *per se* disability, and that Plaintiff has failed to offer evidence upon which to conclude that her asymptomatic HIV substantially limits any major life activity.

■ The ADA classifies neither HIV, nor any other disease or condition, as a *per se* disability.[2] Instead, application of the statute to a given individual depends on whether that individual has a physical or mental impairment, and whether that impairment substantially limits a major life activity of that individual. 42 U.S.C. § 12102(A). The Court is persuaded that asymptomatic HIV constitutes a physical impairment for the purposes of the ADA. The interpretive guidelines specifically include HIV, whether symptomatic or asymptomatic, among the types of diseases that constitute disabilities. 28 C.F.R. § 36.104. The vast weight of the authority also supports the proposition that HIV constitutes a physical impairment for the purposes of the ADA.[3] *See Gates v. Rowland*, 39 F.3d 1439, 1446 (9th Cir.1994); *Doe v. Garrett*, 903 F.2d 1455, 1459 (11th Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991); *EEOC v. Chemtech International Corp.*, 1995 WL 608355 at *1 (S.D.Tex.1995); *Austin v. Pennsylvania Department of Corrections*, 876 F.Supp. 1437, 1465 (E.D.Pa.1995); *Robinson v. Henry Ford Health Systems*, 892 F.Supp. 176, 180 (E.D.Mich.1994); *Howe v. Hull*, 873 F.Supp. 72, 78 (N.D.Ohio 1994); *Doe v. Kohn Nast & Graf, P.C.*, 862 F.Supp. 1310, 1318–20 (E.D.Pa.1994); *T.E.P. v. Leavitt*, 840 F.Supp. 110, 111 (D.Utah 1993); *Doe v. District of Columbia*, 796 F.Supp. 559, 568 (D.D.C. 1992); *Glanz v. Vernick*, 756 F.Supp. 632, 635 (D.Mass.1991).

■ Less clear is whether Plaintiff's asymptomatic HIV substantially limits one or

1. Based on the statute and interpretive guidelines, Defendant's office constitutes a place of public accommodation. The Department of Justice interpretive guidelines for the ADA define a place of public accommodation as including the professional office of a health care provider whose operations affect interstate commerce. 28 C.F.R. § 36.104. While not binding, such regulations carry significant persuasive weight. *See Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 781 (1st Cir.1990).

2. The Court departs from the analysis employed by the two district courts that have considered the factual issue presented in this case. *See D.B. v. Bloom*, 896 F.Supp. 166, 170 (D.N.J.1995); *United States of America v. Morvant*, 898 F.Supp. 1157, 1161 (E.D:La.1995). In both of those cases, the courts assumed that since the interpretive guidelines include HIV among physical or mental impairments, the plaintiffs were disabled for purposes of the ADA. *Bloom*, 896 F.Supp. at 170; *Morvant*, 898 F.Supp. at 1161. Both the *Bloom* and *Morvant* courts failed to further inquire whether the plaintiffs' HIV substantially limited a major life activity. The statute, however, plainly requires a plaintiff seeking protection to demonstrate that the physical or mental impairment asserted also substantially limits a major life activity. 42 U.S.C. § 12102(2)(A).

3. The interpretive guidelines state that the ADA shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973. 28 C.F.R. § 36.103. Thus, cases construing similar language in the Rehabilitation Act impact interpretation of the ADA.

more of her major life activities. *See* 42 U.S.C. § 12102(2)(A). The Court concludes that it does. Plaintiff identifies reproduction as the sole major life activity that her asymptomatic HIV substantially limits. She asserts that the risk of transmitting HIV to a potential child, as well as possible harm to her own immune system, has deterred her from having children.[4] The Court, therefore, must inquire (1) whether reproduction constitutes a major life activity, and, if so, (2) whether Plaintiff's HIV substantially limits that major life activity. 42 U.S.C. § 12102(2)(A). An examination of both of these inquiries leads the Court to conclude that Plaintiff's asymptomatic HIV substantially limits her major life activity of reproduction.

As a matter of common sense, the outcome of the first inquiry seems obvious. Reproduction, one of the most fundamental of human activities, must constitute a major life activity. From the perspective of the ADA, however, that issue becomes somewhat murky. The interpretive guidelines define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 36.104. At least one court has determined that reproduction does not constitute a major life activity for the purposes of the ADA, reasoning that one does not engage in reproduction with the same frequency as walking, seeing, speaking, breathing, learning and working. *Zatarain v. WDSU–Television, Inc.*, 881 F.Supp. 240, 243 (E.D.La. 1995).

■ The Court, however, concurs with the majority of courts who have concluded that reproduction does constitute a major life activity. *See Erickson v. Northeastern Illinois University*, 911 F.Supp. 316 at 321, (N.D.Ill. 1995); *Pacourek v. Inland Steel Co.*, 858

F.Supp. 1393, 1404–05 (N.D.Ill.1994); *Kohn Nast & Graf, P.C.*, 862 F.Supp. at 1320–21; *District of Columbia*, 796 F.Supp. at 568; *Cain v. Hyatt*, 734 F.Supp. 671, 679 (E.D.Pa. 1990). Rather than limit major life activities, the interpretive guidelines define major life activities as functions *such as* caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 28 C.F.R. § 36.104 (emphasis added). Use of the words "such as" indicates an illustrative, not exclusive, list of major life activities. *Kohn, Nast & Graf*, 862 F.Supp. at 1320. Moreover, as the Eastern District of Pennsylvania points out, Congress chose to use the broad term "major life activities" rather than a more limited term, such as "major work activities." *Id.* In other settings, the interests in conceiving and raising one's own children have been recognized as essential and basic civil liberties. *Cain*, 734 F.Supp. at 679 (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)).

Reducing reproduction to the specific act of conception ignores the processes that occur continually in both male and female reproductive systems in order to achieve conception. *Erickson*, 911 F.Supp. at 321. Limitation of reproduction to conception also ignores the process of raising and caring for offspring upon which successful reproduction depends. The reasoning of courts that have already considered the issue, as well as the broad language of both the statute and the interpretive guidelines persuade this Court that reproduction constitutes a major life activity for the purposes of the ADA.

■ Finally, based on the undisputed evidence, the Court concludes that Plaintiff's asymptomatic HIV substantially limits her major life activity of reproduction.[5] The

---

4. Intervenor Plaintiff MHRC further asserts that asymptomatic HIV substantially limits other major life activities such as the victim's sex life. A close reading of the statutory language, however, reveals the need for an individual determination of substantial limitation. *See* 42 U.S.C. § 12102(2)(A) (disability requires substantial limitation of major life activity of "such individual"). Accordingly, while the MHRC may be generally

correct that asymptomatic HIV can substantially limit a victim's sex life, Plaintiff has offered no evidence on that issue, leaving the Court unable to analyze it in a Summary Judgment context.

5. In order to constitute a disability, an individual must have a physical or mental impairment that substantially limits a major life activity *"of such individual."* 42 U.S.C. § 12101(2)(A) (emphasis

Parties have not presented evidence that Plaintiff's asymptomatic HIV poses a direct barrier to Plaintiff's ability to reproduce, in the sense, for example, that it has rendered her infertile. The statutory language, however, does not require such a stringent inquiry. By requiring an individual's physical or mental impairment to *substantially* limit a major life activity, the statute does not contemplate a complete inability of that individual to engage in a particular major life activity. *See* 42 U.S.C. § 12102(2)(A) (emphasis added).

Child birth poses a risk of physical harm to an asymptomatic HIV mother. *See Thomas v. Atascadero Unified School District*, 662 F.Supp. 376, 379 (C.D.Cal.1986) (childbirth dangerous to asymptomatic HIV patient and others). In her deposition Plaintiff testified that fear of harm to her immune system contributed to her decision not to have children once she tested positive for HIV. (Pl.'s Dep. at 79.) In addition, an HIV positive mother runs the risk of infecting her child, during pregnancy, through child birth or, if she chooses to do so, through breast feeding. In her deposition, Plaintiff also indicated that fear of infecting her child contributed to her decision not to have children. (Pl.'s Dep. at 79.) Finally, as previously indicated, reproduction extends beyond the act of conception and the period of gestation, to the process of caring for and raising a child. In her deposition, Plaintiff cited fear that her child would lose its mother as another reason for not having children. (Pl.'s Dep. at 79.) Defendant does not dispute any of Plaintiff's asserted reasons for not having children, and those reasons all stem from her HIV positive status. The Court concludes that Plaintiff has established that her asymptomatic HIV has substantially limited her major life activity of reproduction.[6]

The Court concludes that Plaintiff is disabled as a matter of law under the ADA.

*2. Treatment of Plaintiff in Defendant's Dental Office Poses no Significant Risk to the Health and Safety of Others*

■ The ADA does not require a covered entity to extend its public accommodations to any individual who poses a direct threat to the health or safety of others. 42 U.S.C. § 12182(b)(3). Direct threat means "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services." *Id.* The interpretive guidelines further define direct threat as a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures. 28 C.F.R. § 36.208(b). In determining whether an individual poses a direct threat, the guidelines contemplate that "a public accommodation must make an individualized assessment, based on reasonable medical judgment that relies on current medical knowledge ... to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk." 28 C.F.R. § 36.208(c); *see also School Board of Nassau County v. Arline*, 480 U.S. 273, 287–88, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987) (employing similar factors in Rehabilitation Act, employment discrimination context).

Defendant asserts that performance in his office of invasive dental procedures, such as filling a cavity, on HIV patients poses a significant risk to the health and safety of others that cannot be eliminated. Plaintiff contends that implementation of Centers for

---

added). Thus, the Court's inquiry is not whether such impairment substantially limits the major life activity of reproduction generally, but whether in this case, Plaintiff's asymptomatic HIV substantially limits her major life activity of reproduction. *See id.*

**6.** Defendant offers statistics demonstrating a 25% risk of transmission of HIV from mother to child and argues that such a low risk cannot possibly translate into a disability under the ADA.

Defendant, however, misconstrues the inquiry. The Court has determined that the HIV virus constitutes a physical impairment under the ADA. The Court has also concluded that reproduction constitutes a major life activity. Thus, the Court's inquiry is not whether a low risk of transmission from mother to child constitutes a disability under the ADA, but whether asymptomatic HIV, in this case, substantially limits Plaintiff's major life activity of reproduction.

Disease Control (CDC) recommended precautionary measures eliminates any significant risk in-office treatment may pose, and, therefore, that Defendant's infectious disease policy as applied to her and similarly situated HIV patients constitutes discrimination on the basis of a disability for purposes of the ADA.[7]

### a. Weight of the Evidence

Pursuant to Rule 56, litigants may not base their Motions or opposition to Motions for Summary Judgment on mere allegations or denials of the adverse party's pleading. Fed. R.Civ.P. 56(e). Instead, Summary Judgment requires affidavits, depositions or answers to interrogatories that set forth specific facts as would be admissible in evidence. *Id.* In the context of the direct threat inquiry, the interpretive guidelines provide specific guidance to courts analyzing the risk to a public accommodation under title III. 28 C.F.R. § 36.208(c). The interpretive guidelines codify, for ADA purposes, the analysis employed by the Supreme Court in a Rehabilitation Act context. *See Arline*, 480 U.S. at 288, 107 S.Ct. at 1131. The Supreme Court, in *School Board of Nassau County v. Arline*, emphasized that courts engaging in such an analysis "normally should defer to the reasonable medical judgments of public health officials." *Id.*

The Parties' arguments focus on how HIV can be transmitted and the probability of transmission in the dental health context, two of the four analytical prongs established by the interpretive guidelines. *See* 28 C.F.R. 36.208(c). Defendant asserts that performing invasive dental procedures on Plaintiff creates a significant risk of transmission of HIV through contact with Plaintiff's blood.

Defendant points out that filling a cavity involves injecting the mouth with anesthetic and drilling the decayed tooth. Use of a needle creates a risk of transmission through percutaneous needle stick injury, while drilling creates a risk of transmission through spattering and misting blood and bloody saliva. While Defendant asserts that both of these results create an obvious risk of transmission of HIV, Defendant fails to offer the Court Summary Judgment quality evidence to support that assertion.[8] Fed.R.Civ.P. 56. Instead, Defendant argues that quantification of the risk may be impossible, since documentation of the transmission of HIV from infected patient to dentist in many cases may not occur, and, therefore, such transmission may be occurring with alarming frequency. Again, Defendant fails to offer evidence to support that assertion.

Defendant buttresses his argument with tangential statistics. Defendant points out that three to four percent of the individuals who carry HIV have not identified any of the risk factors for becoming infected. By contrast, Defendant asserts, six percent of all health care workers who have contracted HIV exhibit no risk factors. Finally, Defendant points out that in 42 documented cases, health care workers have suffered occupational transmission of HIV. Defendant concludes that although no documented case of a dentist suffering occupational transmission has occurred, that will likely change. In lieu of the reasonable medical judgment of a public health official, Defendant essentially asks the Court to infer a significant risk from a combination of his conjecture as to potential transmission and statistics which at best may place health care workers at a higher risk of

---

7. The CDC has issued guidelines to reduce the risk of transmission of infectious diseases in a report entitled *Recommended Infection–Control Practices for Dentistry*, published in 1993. The CDC provides recommendations concerning every aspect of dental practice, including vaccinations for dental workers, protective attire and barrier techniques, hand care, use of sharp instruments and needles, sterilization of instruments, disinfection of the dental unit and environmental surfaces, use and care of hand pieces and other dental devices, single use disposable instruments, etc.

8. Although the Supreme Court directs district courts to defer to the reasonable judgment of public health officials, *Arline* failed to reach the issue of whether courts should also defer to the reasonable medical judgments of private physicians on which an employer has relied. 480 U.S. at 288 n. 18, 107 S.Ct. at 1131 n. 18. Defendant relied on the expert testimony of Sanford Kuvin, M.D. With respect to transmission through aerosol mist, Dr. Kuvin testified that although no one knows whether such transmission is possible, no evidence currently supports aerosol spray as a mode of transmission of HIV.

contracting HIV.[9] The Court cannot grant Summary Judgment on the basis of allegation or speculation. *See* Fed.R.Civ.P. 56. Instead, the Court must evaluate the risk based on the current state of medical knowledge, and defer to the reasonable medical judgments of public health officials. 28 C.F.R. 36.208; *Arline,* 480 U.S. at 288, 107 S.Ct. at 1131. Defendant has failed to meet his Summary Judgment burden.

Plaintiff, by contrast, offers the reasonable medical judgment of a public health official, CDC, to refute Defendant's allegations that treatment of her in his office poses a direct threat. Specifically, Plaintiff presented testimony from Wayne Marianos, D.D.S., M.P.H., who serves as Captain in the United States Public Health Service at the Centers for Disease Control ("CDC"), and who currently serves as the Director of the Division of Oral Health. Dr. Marianos participated in the development of the CDC recommended precautions for dentists to prevent the transmission of infectious diseases. He testified both as to the risk of transmission of HIV in a dental setting, as well as to the CDC recommended practices designed to minimize that risk. Dr. Marianos testified that when implemented, the CDC recommendations reduce the already low risk of disease transmission in the dental environment, from either patient to dental health care worker, dental health care worker to patient, or patient to patient. Dr. Marianos further testified that routine dental treatment to persons with HIV or AIDS requires no additional procedures beyond the CDC recommendations.[10] In other words, Plaintiff has provided evidence, of Summary Judgment quality, of a reasonable medical judgment of a public health official, based on current medical knowledge, that treating HIV positive patients such as Plaintiff in a dental office does not pose a direct threat to the health and safety of others.[11]

### b. *Weight of the Authority*

Both Parties assert that the weight of judicial authority supports their position. Defendant points to a line of case law in which courts have held that the suspension or termination of HIV infected health care workers does not constitute discrimination under title III. *See Doe v. University of Maryland Medical System Corporation,* 50 F.3d 1261, 1267 (4th Cir.1995); *Bradley v. University of Texas M.D. Anderson Cancer Center,* 3 F.3d 922, 925 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994); *Leckelt v. Board of Commissioners of Hospital District No. 1,* 909 F.2d 820, 830 (5th Cir.1990); *Mauro v. Borgess Medical Center,* 886 F.Supp. 1349, 1354 (W.D.Mich.1995); *Scoles v. Mercy Health Corporation,* 887 F.Supp. 765, 772 (E.D.Pa.1994); *Doe v. Washington University,* 780 F.Supp. 628, 634–35 (E.D.Mo.1991). Defendant argues that the health care worker cases further support his assertion that Plaintiff poses a direct threat to the health and safety of others. The Court concludes,

9. Defendant asserts that the Federal Drug Administration ("FDA") believes the risk of occupational transmission to dentists is significant, based on the FDA's recommendation that any person who has been exposed to the blood of a patient in the previous year should not be permitted to donate blood. The FDA recommendations pertain to prevention of HIV transmission by blood and other blood products. Nowhere does the FDA express a concern regarding the occupational risk of transmission to dentists. The FDA simply lists among several other criteria for donor unsuitability "persons who have had contact with blood and body fluids through percutaneous inoculation (such as injury or accidental needlestick) ..." (Def.'s Mem. Opp'n.Summ. J., Ex. 4a at 4–5.) Based on that statement alone, the Court is not willing to infer that the FDA has determined that dentists suffer a significant risk of occupational transmission.

10. Plaintiff also offers the opinion of the American Dental Association, which concurs with Dr. Marianos that routine adherence to the recommended procedures results in little risk of transmission, and stresses that a dentist should not refuse to treat a patient whose condition is within the dentist's current realm of competence solely because the patient carries HIV.

11. With respect to the other two analytical prongs, the duration and severity of the risk, the evidence demonstrates that the risk is lifelong, in that no cure for HIV exists, and, severe in that the potential harm to third parties, here Defendant, is illness and death. *See Arline,* 480 U.S. at 288, 107 S.Ct. at 1131 (explaining test). In this case, however, neither the duration nor severity outweigh the evidence as to how the disease is transmitted and the slight probability of transmission. *See Morvant,* 898 F.Supp. at 1166.

however, that the key distinction in those cases—HIV infected health care workers as opposed to patients—renders them inapposite to this case.

The HIV health care worker cases that mention the judgment of a public health authority rely on CDC recommendations for minimizing transmission of infectious diseases from health care workers to patients, rather than from patients to dentists. *See University of Maryland,* 50 F.3d at 1263; *Bradley,* 3 F.3d at 924; *Leckelt,* 909 F.2d at 828 and n. 17; *Washington University,* 780 F.Supp. at 633. In *Doe v. University of Maryland System Corporation,* for example, the CDC recommendations indicated that hospitals could bar HIV infected health care workers from performing those procedures the hospital had identified as exposure prone. 50 F.3d at 1263, 1266; *see also Bradley,* 3 F.3d at 924 (same CDC recommendations); *Leckelt,* 909 F.2d at 828 (prior version of same guidelines). As indicated, deference to the relevant CDC guidelines in this case, combined with the testimony of one of the authors of those guidelines, logically compels this Court to a different conclusion.

A closer examination of some of the health care worker cases reveals that HIV infected health care workers posed a direct threat in part because of the nature of the relationship between health care provider and patient. *See University of Maryland,* 50 F.3d at 1266; *Mauro,* 886 F.Supp. at 1353; *Washington University,* 780 F.Supp. at 633–34. The court in *Doe v. Washington University,* for example, viewed the risk of transmission from a dental student to patient in the context of the stated goal of the medical profession "to heal, and . . . if healing is not possible, . . . not to harm." 780 F.Supp. at 633. According to that court, to permit even an occasional death to occur because of a failure to scrupulously guard the safety of patients would appear to be morally unacceptable. 780 F.Supp. at 633–34; *see also University of Maryland,* 50 F.3d at 1266 (defendant made a considered decision to err on side of caution and acted solely with patients' best interests in mind); *Mauro,* 886 F.Supp. at 1353 (exposing patient to direct risk of acquiring a fatal disease is fundamentally inconsistent with mission of patient care).

The health care provider-patient relationship, however, is not symmetrical. Defendant in this case does not occupy the same vulnerable position as patients in the case of an HIV infected dentist, because Defendant, and not Plaintiff, controls the level of risk. The reasonable medical judgment of the CDC indicates that a dentist protects him or herself by diligently implementing the CDC recommended precautions. Compliance with the CDC recommended precautions, however, is up to the dentist. A patient has no control over the less diligent health care provider whose failure to comply with CDC guidelines significantly increases the risk of patient infection. *See, e.g., Leckelt,* 909 F.2d at 829–30 (evidence suggested that plaintiff nurse failed to comply with CDC recommendations).

In *Leckelt v. Board of Commissioners of Hospital District No. 1,* the plaintiff, an HIV infected nurse, asserted that as long as he followed the CDC guidelines, he posed little or no risk of transmitting HIV to his patients. 909 F.2d at 829. Evidence of his failure to consistently comply with the CDC guidelines, as well as hospital policies based on those guidelines, undermined his argument. *Id.* at 829–30. The Fifth Circuit pointed out that by his conduct, the plaintiff prevented the defendant hospital from deciding what measures, if any, were necessary to protect the health of the plaintiff, other employees and patients. *Id.* at 830. Implicit in that finding is the Fifth Circuit's concern that no amount of reasonable medical judgment as to risk reduction can protect a patient from an incautious health care provider. *See id.* In this case, by contrast, Defendant exercises complete control over the reduction of his risk, and bears the consequences of a lapse in his diligence. That critical difference fatally undermines Defendant's efforts to apply the health care workers cases to the direct threat analysis in this case.

Indeed, the federal courts that have examined the same or factual scenarios similar to those present in this case have concluded that the risk of transmission from patient to dentist does not rise to the level of a direct

threat to the health or safety of others and that refusals to treat HIV positive patients in the dental office constitutes unlawful discrimination under the ADA. *See D.B. v. Bloom,* 896 F.Supp. 166, 170 n. 6 (D.N.J.1995) (similar facts established prima facie case under ADA and no medically justified reason existed for defendant's refusal to treat HIV infected plaintiff); *United States of America v. Morvant,* 898 F.Supp. 1157, 1166–67 (E.D.La.1995). In *Morvant,* a dentist referred HIV infected patients to another dentist rather than treat them in his office. 898 F.Supp. at 1159. In analyzing whether the HIV infected patients posed a direct threat to the dentist, the court pointed to "a plethora of expert testimony presented by the government" that the CDC's recommendations, if implemented, would significantly mitigate any risk. *Id.* at 1166. As in *Morvant,* this Court has made a similar finding based on the reasonable medical judgment of a public health official.[12] *See Arline,* 480 U.S. at 288, 107 S.Ct. at 1131.

■ Defendant has provided neither Summary Judgment quality evidence, nor judicial authority that can lead to the conclusion that treatment of Plaintiff in his office constitutes a direct threat to the health and safety of others. Plaintiff has refuted Defendant's speculative evidence with the reasonable medical judgment of a public health official, in this case, the CDC. Defendant has failed to demonstrate that CDC's judgment is medically unsupportable. *See id.* at 286 n. 15, 107 S.Ct. at 1130 n. 15. This Court, therefore, must defer to the CDC, and concludes that if Defendant implements the CDC recommended precautions, treatment of Plaintiff in his office poses no direct threat to the health or safety of others.[13]

### C. MHRA

■ The Parties have also moved for Summary Judgment on Plaintiff's MHRA claims. The Maine Supreme Court has indicated that analogous federal law informs the interpretation of the MHRA. *Bowen v. Department of Human Services,* 606 A.2d 1051, 1053 (Me.1992); *Plourde v. Scott Paper Co.,* 552 A.2d 1257, 1261–62 (Me.1989). This is particularly true in a question of first impression. *Bowen,* 606 A.2d at 1053. Defendant seeks a separate MHRA finding only with respect to whether his office constitutes a place of public accommodation. The Court concludes that Defendant's office constitutes a place of public accommodation under the MHRA, and, therefore, applies the findings with respect to discrimination under the ADA to Plaintiff's MHRA claim.

Similar to the ADA, the MHRA prohibits public accommodations from discriminating on the basis of disability. 5 M.R.S.A. § 4592. The MHRA defines a place of public accommodation as "any establishment that in fact caters to, or offers its goods, facilities or services to, or solicits or accepts patronage from, the general public, and includes but is not limited to: ... clinics, hospitals,...." 5 M.R.S.A. § 4553(8). Defendant urges con-

---

12. The court in *Morvant* viewed the CDC recommended precautions as modifications that would eliminate the direct threat. 898 F.Supp. at 1166. This Court disagrees with that analysis. CDC recommends that dentists implement the precautions in virtually every procedure. They are universal. As such, CDC contemplates that the precautions will become part of the normal practice routine in dentistry. The Court, therefore, views the precautions as part of the practice of dentistry, and concludes that in light of modern dental methods, treatment of Plaintiff does not pose a direct threat to the health and safety of Defendant, his staff, or his patients.

13. The implementing guidelines indicate that a public accommodation must make an individualized determination of whether the extension of services to that individual would pose a direct threat to the health or safety of others. 28 C.F.R. § 36.208. Nothing in the Court's conclusion should be interpreted as preventing Defendant, upon an individualized assessment, from determining in a given case that treatment of a patient with a disability in his office would pose a direct threat to the health and safety of others. By the same token, while this opinion applies specifically to Plaintiff, the implications of the reasonable medical judgment of the CDC are that treatment of HIV positive individuals in a private dental office generally does not pose a direct threat to the health and safety of others. In other words, an individualized assessment as to whether treatment of a particular patient poses a direct threat to the health and safety of others must consider the four pronged analysis offered by the interpretive guidelines, and must defer to the reasonable medical judgment of a public health official where such judgment is available. *See id., Arline,* 480 U.S. at 288, 107 S.Ct. at 1131.

struction of the MHRA in accordance with the principles of *ejusdem generis,* arguing that private dental offices are not similar enough to the enumerated public accommodations to be included under the MHRA. *See Buker v. Town of Sweden,* 644 A.2d 1042, 1044 (Me.1994) (citing *Penobscot Nation v. Stilphen,* 461 A.2d 478, 489 (Me.1983)) (under *ejusdem generis,* a general term followed by a list of illustrations is assumed to embrace only concepts similar to illustrations). The Court disagrees.

The prefatory language prior to the enumerated list of public accommodations is extremely broad and includes any establishment that offers its facilities or services to the general public. 5 M.R.S.A. § 4553(8). By itself, that language includes a commercial dental office. The prefatory language also indicates that the definition of public accommodations *includes but is not limited to* the list of illustrations. 5 M.R.S.A. § 4553(8) (emphasis added). In light both of the breadth of the language and its stated non-exclusivity, it strains neither logic nor statute to include private dental offices within the definition of public accommodations.

As indicated, the Maine Supreme Court directs courts interpreting the MHRA to look to analogous federal law for guidance, particularly in questions of first impression. *Bowen,* 606 A.2d at 1053. The Court has not found a single Maine case answering the inquiry of whether a private dental office constitutes a public accommodation under the MHRA. None of the Parties, however, disagree that Defendant's office constitutes a public accommodation under the ADA.

Accordingly, the Court concludes that Defendant's office constitutes a place of public accommodation under the MHRA. Based on the Court's findings with respect to Plaintiff's ADA claim, the Court concludes that Defendant's conduct also violates the MHRA.

### D. Constitutional Issues

Defendant challenges the constitutionality of the ADA as applied to him on three grounds: (1) Congress lacks the authority under the Commerce Clause to regulate his dental practice; (2) the ADA violates Defendant's due process right to freedom from unjustified intrusions on his personal security; and (3) the ADA violates Defendant's due process right to freedom of contract. The Court concludes that the ADA passes constitutional muster under all three of Defendant's challenges.

### 1. Commerce Clause

■ Defendant, citing the Supreme Court's recent decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), argues that the activity of filling a cavity does not substantially affect interstate commerce, and that the practice of dental medicine is an area of law reserved to the states, and thus beyond the scope of Congress' Commerce Clause authority.

■ Congress' power to regulate commerce derives from Article I, section 8 of the United States Constitution.[14] The Supreme Court has construed the Commerce Clause as a broad grant of regulatory authority to Congress. *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). Congress' commerce power is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." *Id.* (Citing *Gibbons v. Ogden,* 9 Wheat. 1, 196, 6 L.Ed. 23 (1824)).

■ The Supreme Court has identified three types of activity that constitute commerce under the Commerce Clause. *Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1629–30. These include (1) the use of the channels of interstate commerce, (2) the instrumentalities of interstate commerce or persons or things in interstate commerce, or (3) those activities having a substantial relationship to interstate commerce. *Id.* In the event that the target activity of a regulation constitutes commerce, that regulation must then survive rational basis scrutiny, meaning that the regulation must be rationally related to a legitimate constitutional end, and the

---

**14.** Article I, section 8 reads in relevant part, "The Congress shall have the power ... [t]o regulate Commerce ... among the several states."

means chosen by Congress must be reasonably tailored to reach that end. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964); *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360.

■ The Court notes that the preliminary question of whether an activity has a substantial enough effect on commerce to fall within the boundaries of congressional commerce authority is left to the courts. *Katzenbach v. McClung*, 379 U.S. 294, 303, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964); *Lopez*, — U.S. at —, — n. 2, 115 S.Ct. at 1629, 1629 n. 2. Defendant argues that because the activity at issue—dental medicine—occurs purely intrastate, this Court must find that it substantially affects commerce in order to find it within Congress' regulatory authority under the Commerce Clause. *See United States v. Robertson*, — U.S. —, —, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995) (affecting commerce test designed to define extent of congressional authority over purely intrastate activity). The Court finds that Defendant's intrastate dental practice has a substantial enough impact on interstate commerce to fall within Congress' regulatory purview under the Commerce Clause.

■ Under the Commerce Clause, Congress may regulate one entity's purely intrastate activity, even if that activity has a minimal affect on interstate commerce, provided that entity belongs to a class whose aggregate activity substantially affects commerce among the states or with foreign nations. *Hodel*, 452 U.S. at 277, 101 S.Ct. at 2360 (citing *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975)); *Katzenbach*, 379 U.S. at 300–01, 85 S.Ct. at 381–82; *see also Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942). Thus, even if Defendant's purchase of supplies and equipment from out of state, receipt of payments from out of state insurers and credit card companies, and

attendance of classes and conferences out of state by themselves do not substantially affect interstate commerce, the Court is satisfied that those commercial activities, taken together with the activities of other dentists similarly situated, have an effect on interstate commerce substantial enough to fall within the reach of congressional authority under the Commerce Clause. *See Katzenbach*, 379 U.S. at 300–01, 85 S.Ct. at 381–382; *Wickard*, 317 U.S. at 127–28, 63 S.Ct. at 89–90.

■ Defendant argues that none of the interstate transactions in which he engages bear on the determination of whether Congress can constitutionally regulate him.[15] Instead, Defendant asserts, the Court must focus solely on the narrow activity the ADA is attempting to prohibit, the filling of a cavity in a hospital rather than a dental office. Defendant contends that filling a cavity in a hospital rather than his office can have no greater effect on interstate commerce than possession of a gun in a "school zone," which the Supreme Court recently examined in *Lopez*, — U.S. at —, 115 S.Ct. at 1626 (description of Gun Free School Zones Act of 1990 at issue).

In striking down the Gun Free School Zones Act, the *Lopez* Court focused on the nature of that statute, concluding that by its terms the Gun Free School Zones Act neither regulated commercial nor economic activity, nor bore any nexus to such activity. — U.S. at — - —, 115 S.Ct. at 1630–31. Instead, the Supreme Court reiterated a familiar theme running through modern Commerce Clause jurisprudence: "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at —, at 1630. The Supreme Court emphasized that the statute at issue in *Lopez* had nothing to do with commerce. — U.S. at — - —, 115 S.Ct. at 1630–31.

Congress may regulate any economic activity that substantially affects interstate commerce. *Lopez*, — U.S. at —, 115 S.Ct. at 1630. As a constitutional matter, therefore, Congress may regulate Defendant's dental practice, an economic activity, provided dental medicine substantially affects interstate commerce. *Id.*

---

**15.** Defendant also asserts that the ADA regulation of the practice of dentistry is not commerce because dentistry is an area of law reserved for the states. Notably, Defendant provides no authority for his assertion. Moreover, this argument ignores the proper inquiry in Commerce Clause cases. Under the Commerce Clause,

By contrast, title III of the ADA seeks to regulate purely economic activity—in this case, the provision of dental services. Defendant is not asserting that he does not accept fees for performing dental services. Indeed, the very activity upon which he seeks the Court to focus—the way in which he fills cavities—constitutes one of the core economic activities of any dental office. Defendant cannot credibly argue that regulation of an economic enterprise that trades in interstate commerce, even one centered on filling cavities, lacks the commercial element or nexus to commercial activity the Supreme Court found lacking in the Gun Free School Zones Act. *See Lopez,* — U.S. at — – —, 115 S.Ct. at 1630–31.

Having determined that title III of the ADA appropriately regulates Defendant's dental practice, the Court must also determine whether title III survives rational basis scrutiny, meaning that title III must be rationally related to a legitimate constitutional end, and that the means chosen by Congress must be reasonably tailored to reach that end. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360; *Heart of Atlanta Motel,* 379 U.S. at 262, 85 S.Ct. at 360. Defendant does not contest title III on rational basis grounds, and the Court concurs in the judgment of the *Morvant* Court that title III meets this minimal scrutiny. *See* 898 F.Supp. at 1167 (upholding constitutionality of ADA through application of rational basis scrutiny).

### 2. Freedom from Unjustified Intrusions on Personal Security

 Defendant next contends that by forcing him to treat HIV positive patients in his office, the ADA contravenes the fundamental right to freedom from unjustified intrusions on his personal security which derives from the Fifth and Fourteenth Amendments to the Constitution. While the Court acknowledges that the Due Process Clauses of the Fifth and Fourteenth Amendments protect such a fundamental right or liberty interest, the Court is not persuaded that Defendant establishes such an interest in this case. *See Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982) (personal security interest recognized in context of confinement by state); *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) (personal security interest recognized in context of corporal punishment of child in public school). None of the cases illuminating the fundamental right to freedom from unjustified intrusions on personal security rest on factual situations even remotely similar to this case.[16] The Court declines to expand this fundamental right to this factual situation.[17]

### 3. Freedom of Contract

 Defendant asserts that the ADA also violates his fundamental right to freedom of contract, also deriving from the Fifth and Fourteenth Amendments to the Constitution, by forcing him to accept patients against his will. Defendant relies on *Meyer v. Nebraska,* a 1923 case in which the Supreme Court, in fleshing out a due process privacy right, mentioned liberty of contract among other interests protected by due process. 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). The *Meyer* Court cited *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), among other cases, as support for the fundamental right to freedom of contract. *Id.* The *Lochner* case and its progeny employed freedom of contract to strike down social legislation regulating aspects of the work place. *See, e.g., Lochner,* 198 U.S. at 52, 25 S.Ct. at 541 (maximum hours statute violated freedom of contract); *Coppage v. Kansas,* 236 U.S. 1, 6, 35 S.Ct. 240, 240, 59 L.Ed. 441 (1915) (statute prohib-

---

**16.** One of the cases upon which Defendant bases his personal security argument, *Russell v. Steck,* 851 F.Supp. 859, 863 (N.D.Ohio 1994), has been expressly rejected by the Sixth Circuit. *Foy v. City of Berea,* 58 F.3d 227, 231 (6th Cir.1995).

**17.** The ADA does not require Defendant to treat anyone who poses a direct threat to the health and safety of others. 42 U.S.C. § 12182(b)(3).

The Court has concluded that treatment of Plaintiff in Defendant's dental office poses no significant risk to the health and safety of others. Thus, even if Defendant correctly identified an application of the fundamental right to freedom from unjustified intrusions on his personal security, that right would not prevent Congress from applying the ADA to him in this context.

iting employers from requiring employees to sign agreements not to join unions violated freedom of contract); *Adkins v. Children's Hospital*, 261 U.S. 525, 539, 43 S.Ct. 394, 395, 67 L.Ed. 785 (1923) (minimum wage for women statute violated freedom of contract). The Supreme Court, however, has dramatically curtailed the due process right to freedom of contract which Defendant seeks to invoke against the ADA.[18]

In *West Coast Hotel Co. v. Parrish*, the Supreme Court expressly overruled *Adkins*, and commenced a reigning in of the due process right to freedom of contract. *See* 300 U.S. 379, 391, 400, 57 S.Ct. 578, 581, 586, 81 L.Ed. 703 (1937). The *Parrish* Court announced that "[l]iberty under the Constitution is ... necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process." 300 U.S. at 391, 57 S.Ct. at 581. The rigor with which courts scrutinize economic legislation since *Parrish* has continued to decline. *See Williamson v. Lee Optical Co. of Oklahoma Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) ("It is enough that there is an evil at hand for correction and that it might be thought that the particular legislative measure was a rational way to correct it"). In *Williamson v. Lee Optical*, for example, the Court was satisfied that it could contemplate any reason for the legislative action at issue, setting an extremely deferential standard of review. 348 U.S. at 487, 75 S.Ct. at 464. In light of *Parrish* and its progeny, which Defendant has declined to discuss, the Court determines that due process freedom of contract fails to provide grounds for declaring the ADA unconstitutional.[19]

### Conclusion

The Court concludes that Defendant's refusal to treat Plaintiff in his dental office constitutes a violation of title III of the ADA and the MHRA. In so concluding, however, the Court in no way suggests that Defendant's motivation is suspect. The position taken by Defendant is not an unreasonable one. The Court is sensitive to Defendant's concerns about the possibility of the transmission of HIV from a patient to him, his staff and other patients, particularly in light of how much science has yet to learn about HIV. The arguments raised by Defendant to support his position are not without merit.

This case ultimately boils down to statutory analysis and evidence. Although Defendant raises some frightening possibilities about the transmission of HIV and the ramifications of those possibilities on dentists, Plaintiff offers the reasonable medical judgment of a public health official that the risk to Defendant does not rise to the level of a direct threat. While that reasonable medical judgment may change in the future as the state of knowledge on HIV transmission changes, the Court must make a present determination based on current medical knowledge. 28 C.F.R. § 36.208(c); *Arline*, 480 U.S. at 288, 107 S.Ct. at 1131. The Court has made its determination, and now concludes that Defendant has violated title III of the ADA and the MHRA.

### Disposition

For the above reasons, the Court:

(1) *GRANTS* Plaintiff's Motion for Summary Judgment;

(2) *GRANTS* the Government's Motion for Summary Judgment on the constitutional issues;

(3) *GRANTS* the MHRC's Motion for Summary Judgment

---

**18.** In *Planned Parenthood v. Casey*, the Supreme Court discussed the demise of the *Lochner* line of cases, noting that it serves as one of only two examples in history in which the Court, despite the principles of *stare decisis*, reversed a line of cases. *See* 505 U.S. 833, 860, 112 S.Ct. 2791, 2812, 120 L.Ed.2d 674 (1992).

**19.** The Court acknowledges that the due process cases upon which it relies examined state statutes under the Due Process Clause of the Fourteenth Amendment. A similarly deferential standard applies with respect to due process challenges to federal statutes. *See, e.g., Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978) (upholding federal regulation in absence of evidence Congress acted irrationally or arbitrarily).

(4) *DENIES* Defendant's Motion for Summary Judgment.

*SO ORDERED.*

### *Enforcement*

The Court has determined that Defendant's conduct violated title III of the ADA, specifically, 42 U.S.C. § 12182(b)(2)(A)(i), and the MHRA, specifically 5 M.R.S.A. § 4592(1). Under both statutes, the Court retains broad authority to grant equitable relief for violations. *See* 42 U.S.C. § 12188(b)(2); 5 M.R.S.A. § 4613. Plaintiff seeks injunctive and declaratory relief under the ADA and MHRA, as well as civil penal damages under the MHRA. Plaintiff also seeks attorney fees and costs.

Based on the factual record assembled for these Motions, it is *ORDERED:*

(1) Defendant is enjoined from refusing to provide treatment in his office to individuals infected with HIV solely on the basis of their HIV positive status, without making an individualized assessment, based on current medical knowledge and the reasonable medical judgment of public health officials, that in-office treatment of any such individual poses a direct threat to the health and safety of others;

(2) the Parties must submit memoranda to this Court relating to any further injunctive relief requested by Plaintiff, civil penal damages, if any, under the MHRA, and attorney fees and costs. Those memoranda shall be submitted on a schedule to be agreed upon by the Parties and approved by the Court.